■ ANONYMOUS, Appellant, v. ANONYMOUS, Respondent.

Judgment entered April 22, 1970, reversed in the exercise of discretion and the interest of justice, without costs and without disbursements, and the matter remanded to the Trial Justice to reopen the proceeding and to continue the hearing in accordance with this memorandum.

Although the court is unanimous for reversal and remand, our dissenting-concurring brother parts company with us as to purpose of the remand; he would limit it merely to fixation of visitation, while we would have examination made by the court into matters bearing on its responsibilities toward its ward rather than the rights and desires of the parents. We here speak only in terms of the child's welfare. *All* the circumstances bearing on that subject, the sole consideration in this case, should be examined before a determination is reached as to visitation, and this regardless of who has failed to come forward with evidence, despite the opportunity so to do, and who has objected to development of the proof, for whatever reason. No one disputes that we have the authority to grant visitation to an illegitimate father. (*People ex rel.* "*Francois*" v. "*Ivanova*", 14 A D 2d 317, affg. McGIVERN, J., at Special Term.) But there are several applicable rules of law, so axiomatic as not to require citation: the child is our ward, and neither parent, despite where custody may reside, has any property right in the child. This being so, it is the duty of the *court*, in exercising its grave responsibility, to become aware of and to seek out every bit of relevant evidence and advice on the subject, and, to that end, the services of the Family Counseling Unit should be availed of. This may be done with or without the consent of the parties, for consent has to do only with enforcement of confidentiality of the Unit's report and of its sources. The purport of *Kesseler* v. *Kesseler* (10 N Y 2d 445), as interpreted in *Knapp* v. *Knapp* (21 A D 2d 761) and *Matter of Lincoln* v. *Lincoln* (24 N Y 2d 270) is not to interdict evidence, particularly professional reports, coming from third parties, but to assure that the Trial Justice "will not use any information, which has not been previously mentioned and is adverse to

either parent, without in some way checking on its accuracy during the course of the open hearing." (*Lincoln,* p. 273.) Long before *Kesseler,* the purposes, function, and limitations upon the Family Counseling Unit were fully and comprehensively discussed in *Matter of Jackson (Woodner),* (N. Y. L. J. July 2, 1956, p. 4, col. 6), attached as Appendix III to the first report of that Unit, September 12, 1956, to the Special Committee on the Family Part of the Association of the Bar. A reading of the decision and the report shows that the circumstances of this case present that type of situation which the Unit was formed to handle.

Professional advice seems peculiarly necessary in this most unusual of situations: the deliberate fathering of a child by a highly intelligent married man, the mother being a highly intelligent professional woman, in circumstances of professed pure love, and his subsequent refusal, after being freed by divorce from his prior marital ties, to enter into marriage with the mother, even while insisting on the privileges of fatherhood. And though the dissenting-concurring opinion is replete with expressions of concern for the child's welfare, it speaks repeatedly of the father's "right to see the child" as though that had been purchased by the generosity of "his support or offers of support."

"Even the most learned of our judges cannot be expected to be technical experts in all of the specialties of medicine or, indeed, other fields of science, any more than skilled physicians who may have had considerable experience in medicolegal matters can be considered to be experts in the technical phases of the law." (Impartial Medical Testimony, 1956, p. 44, quoted in *Matter of Jackson [Woodner], supra.*)

Judges, as professionals themselves, should have the highest respect for the exquisite expertise of other professions, and should seek it out before making a final decision that may forever doom this child's future by way of ineradicable psychological trauma. Truly, "the court's role as *parens patriae* is unending," and it is for that reason that, no matter how overcrowded a court's calendar may be, it must find time for the fullest discharge of duty toward its ward. We therefore remand to continue the hearing on the writ for the purposes and in the manner indicated.

Concur— Eager, J. P., Markewich and Tilzer, JJ., Capozzoli and McGivern, JJ., dissent, in part, in the following memorandum by McGivern, J.:

I am mystified by the majority's decision to remand this for further hearing. We already have a record of 137 pages. The record in *People ex rel. "Francois"* v. *"Ivanova"* (14 A D 2d 317) was four pages, and no "expert" testimony was elicited at all. And in the instant case, the record would have been fuller except for the petulant objections of the mother's counsel, in my view, erroneously upheld by the court. The petitioner father came to court supported by witnesses whose educational qualifications suited them as experts. They should have been heard out. The mother, on the other hand, offered no evidence at all. Thus, we have an extensive record containing not one jot or tittle of evidence detrimental to the father. He emerges as a well disposed, educated, knowledgeable citizen, welcomed in elite circles, and whose visitations to his own child were accepted by the mother for two-and-a-half years with unmurmuring acquiescence. Nor is there the faintest intimation these visits were other than beneficial towards the best interests of the child. And it is entirely clear the visits would have been further welcomed except for the petitioner's refusal to marry the respondent. Further, the child bears the father's name, with the mother's consent, and petitioner has always been most generous in his support or offers of support. His love and affection for the boy are made manifest by the distances he has been willing to travel in order to see

944

his child, and indeed, this proceeding is further earnest of the genuineness of his feelings. His right to see the child is established. (*People ex rel. "Francois"* v. *"Ivanova", supra.*) Legally, he can further be called upon to support the child, and at law, the child may inherit from him. Both parents are gifted and superior people. They have had their day in court. The mother declined her opportunity to present evidence. There is nothing before us supportive of the court's declination of visitation privileges. Another hearing would add little or nothing to what we already know of the unusually able and sophisticated parties. Thus, I would reverse and remand for a hearing limited to the fixation of appropriate schedules, which actually the parties may themselves arrange. And, " If it were done when 'tis done, then 'twere well it were done quickly". Already, for too long a time the father has been barred from a resumption of his visitation rights, which he once enjoyed without let or hindrance. Lastly, the courts are busy enough today without imposing another utterly needless hearing on their overcrowded calendars.

I also take exception to the seeming direction of the majority that the Trial Justice avail himself of the services of the Family Counseling Unit "with or without the consent of the parties". Excellent and helpful these services may be. But their use should be left to the sound discretion of the court, and they cannot be used in the absence of a stipulation evidencing the consent of the parties. And in the absence of a stipulation, such professional reports may not be admitted into evidence or even examined by the court without the consent of the parties. In *Matter of Lincoln* v. *Lincoln* (24 N Y 2d 270, 273) the court, in assaying the *Kesseler* case (10 N Y 2d 445), said " We held that professional reports and independent investigations by the Trial Judge entail too many risks of error to permit their use without the parties' consent."

The majority opinion commends for reading *Matter of Jackson (Woodner)* (N. Y. L. J., July 2, 1956, p. 4, col. 6 per ARTHUR MARKEWICH, J.). I have read with great interest the words of the distinguished jurist who authored the opinion, and I am in complete accord. I note "*Under present statutes and rules this court may not, unless by consent of the parties,* refer a custody question to our one expert social worker. Happily, however, many parties and attorneys in such proceedings have so consented." (Emphasis supplied.) And I note also in the *Jackson* case, the learned Justice at Special Term completely declined a hearing of any sort to a mother of three children, finding on the papers alone that "There is no prima facie presentation either of unfitness of respondent [the father] or of harm or imminent harm to the children." As in the instant case, there is no showing of the father's unfitness, nor was any attempt made to so do.

The majority opinion similarly commends the Family Counseling Unit's report to the Special Committee on the Family Part of the Association of the Bar. I have also read this reference and with me it finds favor, particularly the following excerpts:

" This, *of course, presumed that the attorneys had stipulated* in advance that the report be used as a scientific basis for determining what would best reflect the interests of the child.

" * * * *Unless lawyers willingly stipulate* to full social study, legal machinery is not available to enforce such a course. In addition, the use made of the findings of the caseworker *must also be agreed* upon by the opposing attorneys." (Emphasis supplied.)

Nor do I see any arrangements as to current visitations by the father as "a final decision that may forever doom" the child. Whatever arrangements may eventuate may be changed by the court, or even by the parties themselves,

so as to better comply with future circumstances as they unfold, with particular reference to the age of the child and the situation of the parties then obtaining. (See Domestic Relations Law, § 70.) The court's role as *parens patriae* is unending. (See *Matter of Norman,* 26 Misc 2d 700; *People ex rel. Levine* v. *Rado,* 54 Misc 2d 843.) In the latter case, a distinguished jurist said (p. 844): " In such a proceeding the Supreme Court acts as *parens patriae* of the infant and, motivated exclusively by what is in the best interests of the child, makes a decision which is at best *temporary* in nature and always subject to review or modification." (Emphasis supplied.)