In the Matter of GERALD G. G. (ANONYMOUS). KERRY B. M. (Anonymous) et al., Respondents; GERALD P. G. (Anonymous), Appellant.

Second Department, March 20, 1978

**APPEARANCES OF COUNSEL**

*Finkelstein, Mauriello, Kaplan & Levine, P. C. (Sheila Callahan* of counsel), for appellant.

*Ludmerer & Vurno (George T. Vurno* of counsel), for respondents.

## OPINION OF THE COURT

SUOZZI, J.

In an adoption proceeding, the objectant natural father appeals from an order of the Family Court, Orange County, dated August 11, 1977, which, after a best interests hearing, dismissed the natural father's objections to the adoption of his son, and denied his motion for pyschiatric evaluations of the parties. Leave to appeal from the order has been granted on the court's own motion. The order should be reversed and the objections of the natural father sustained.

The Family Court conducted a hearing as to the best interests of six-year-old boy, born out of wedlock, and dismissed the natural father's objections to the adoption of the child by the natural mother and her present husband, to whom she was married on October 19, 1976. The natural father was given notice of these proceedings pursuant to section 111-a of the Domestic Relations Law. In contrast to the situation of a father of a child who is born in wedlock, in which such father has a veto over any proposed adoption of a child (Domestic Relations Law, § 111, subd 1, par [b]), section 111-a of the Domestic Relations Law gives no equivalent right to a father of a child born out of wedlock. However, he is entitled "to participate in the adoption proceeding at least to the extent of contending that the proposed adoption will not be in the best interests of the child" (Matter of Malpica-Orsini, 36 NY2d 568, 578; see, also, Domestic Relations Law, § 111-a). The denial of a right of veto to the natural parent of a child born out of wedlock has been declared constitutional (Matter of Malpica-Orsini, supra). However, in upholding the constitutionality of section 111 of the Domestic Relations Law, the Court of Appeals did not in any way dilute the duty of the courts to determine whether the best interests of the child will be served by the proposed adoption.

A review of this record leads us to the conclusion that the best interests of the six-year-old boy involved here will not be served by an adoption at this time. Contrary to the suggestion in the dissenting opinion, the standard applied herein is not whether the natural father has been proven unfit, but solely the best interests of the child. A brief review of the facts is in order.

The natural father, who now owns a construction business and earns a net yearly salary of approximately $30,000, first met the natural mother in 1969 in California. She was a

member of the Haight-Ashbury set, "reading palms and selling flowers" when they met. The two established a loving relationship and took up residence together. Of that intimate union, a son, Jerry, was born on March 10, 1971. He was given and has used the surname of his natural father ever since. The natural father assisted in the delivery of the baby and, during the ensuing eight months, performed his husbandly and fatherly duties in an exemplary manner.

In late 1971 or early 1972 the parties terminated their relationship and the natural mother returned to reside in the State of New York with the infant. However, despite the breakup in the parents' relationship, the natural father continued to exhibit a strong love for the child, a love which clearly exists to the present time. During the four-and one-half-year period after the breakup of the relationship between the natural parents, the appellant visited his son in New York about nine times, paid for plane tickets so that his son could visit him in California, provided voluntary and continuous financial support totaling over $16,000 and engaged in mutually warm and loving exchanges with his son by telephone and by mail.

During a visit by the son to California in the summer and fall of 1976, the natural mother traveled to California, took physical custody of the boy and returned to New York. That abrupt act by the natural mother did not deter the natural father. Shortly thereafter he initiated a filiation proceeding in the Family Court of Orange County and, by order dated May 12, 1977, was adjudicated the father of his child.

This factual background clearly indicates that the appellant was, at all times, a devoted and concerned parent. In this respect, his conduct stands in stark contrast to that of the father of the child born out of wedlock in *Matter of Malpica-Orsini*. In that case the Court of Appeals rejected a constitutional attack on section 111-a of the Domestic Relations Law by the natural father of a child born out of wedlock and, at the same time, affirmed an order of adoption of that child by the natural mother and the spouse to whom she had recently been wed. In so doing, the court took pains to point out that the record indicated that the natural father had defaulted in mandatory support payments, that he was given to "violent rages", that he "tore a telephone off the wall, that he ripped all electric wires out of the mother's car and threatened to take the child and disappear so the mother could never see

her" (*Matter of Malpica-Orsini*, 36 NY2d 568, 577, *supra*). The parties in *Malpica* further stipulated that (p 577) "the Court would have sufficient facts before it * * * to exercise its discretion to deny his objections and approve the adoption on the grounds that the overall best interest of the child would warrant it".

With regard to the natural mother, it is clear from the record that she genuinely loves her son. However, that fact alone does not give her and any spouse she chooses to marry the automatic right to adopt the infant, without appropriate judicial scrutiny.

The ability of the natural mother to establish a continuing and stable family relationship has not been demonstrated on this record and is open to serious question. She lived with the natural father for just over two years. Thereafter, she lived with a male "boarder" for six months. She then married her present spouse after living with him for several months. In our view, the natural mother has not displayed that sense of devotion to a stable family structure which should be the prime ingredient in determining the wisdom of approving an application for adoption. Nor is her marriage of little more than a year's duration conclusive evidence that she will maintain a stable family structure with her present spouse, the proposed adoptive parent.

Quite apart from the natural mother's character or the stability of her present household, it is hard to see what appreciable benefit would inure to the child should the adoption be approved at this time. Under the circumstances of this case, it can be presumed that the child is presently aware, or will eventually become aware, of the fact that he was born out of wedlock. No order of adoption will ever erase that fact from his mind. Nor is an adoption required in order to give a home to a homeless boy or because of an absent, unknown or hostile parent. Although we recognize that the child presently enjoys the trappings and benefits of a family unit created by the natural mother and her spouse, it is also equally true that an order of adoption cannot by itself contribute or add anything to the quality of this child's upbringing. We are also quite aware of the fact that three witnesses, who were characterized by the Family Court as "disinterested", testified in favor of the adoption. Two of those witnesses were officials of schools in which the child was enrolled. Of these two witnesses, one described the boy as a delightful "normal American boy" who

enjoyed a good relationship with his mother. That witness did not address any of her testimony to the natural mother's spouse. The other two witnesses were social friends of the natural mother and her spouse, but had not had many opportunities to observe any interaction between the latter and the child. Even if the testimony of these witnesses is accepted in its most favorable light, it does not add to or enhance the argument in favor of an adoption by one iota.

Finally, it is our view that an adoption at this time might very well be adverse to the child's best interests. In this regard, it must be stressed that, pursuant to subdivision 1 of section 117 of the Domestic Relations Law, an order of adoption relieves the natural parent of "all parental duties toward and of all responsibilities for * * * such adoptive child" and places those duties and responsibilities on the adoptive parents. The order of adoption also precludes the child from sharing in any "intestate descent and distribution of real and personal property" of his natural parents (Domestic Relations Law, § 117, subd 2; see, also, *Matter of Scranton v Hutter,* 40 AD2d 296). The record indicates that the natural father has always earned fairly substantial income and has supported his child voluntarily and generously. In contrast, the testimony adduced at the trial indicates that although the natural mother's husband was awarded a bachelor's degree in political science in 1968, he is presently self-employed as a painter, operator of a fruit farm and a pruning contractor, depending on the season of the year, and earned approximately $7,000 in 1976.

An additional factor must also be taken into account at this point. Since the decision of the Supreme Court of the United States in *Stanley v Illinois* (405 US 645), it is clear that the father of a child born out of wedlock has a right to association with his child "which is cognizable and, indeed must be recognized, by the courts" *(Matter of Pierce v Yerkovich,* 80 Misc 2d 613, 614). It is undisputed that the courts of this State have the authority to grant visitation rights to the father of a child born out of wedlock and, in several cases, have granted those rights to the father of such a child (see *Anonymous v Anonymous,* 34 AD2d 942; *People ex rel. "Francois" v "Ivanova",* 14 AD2d 317; *Matter of "Z" v "A",* 36 AD2d 995; *Matter of Pierce v Yerkovich, supra).* The best interest of the child is the ultimate standard to be applied in determining the question of visitation *(Anonymous v Anonymous, supra;*

*E.R. v D.T.,* 77 Misc 2d 242). However, it must be noted that none of those cases involved an application by the father of a child born out of wedlock to visit the child after his adoption by the natural mother and a new spouse. Indeed, absent express consent of the natural mother and the adoptive father (see *Matter of Raana Beth N.,* 78 Misc 2d 105), it may well be that a court would hold that the best interests of the child would not be served by allowing the natural father visitation rights subsequent to an adoption of the born-out-of-wedlock child by the natural mother and her new spouse. Accordingly, if this adoption is approved, the natural father will be precluded, for all practical purposes, from visiting his son. In the face of the mutual relationship of love exhibited between the boy and his natural father, it is our view that any sharp curtailment of contact between the boy and his father at this point in time would not be in the child's best interests.

TITONE, J. (dissenting). Pursuant to section 111-a of the Domestic Relations Law, a natural father is entitled to participate in an adoption proceeding only to the extent of presenting evidence relative to the child's best interests. In *Matter of Malpica-Orsini* (36 NY2d 568), the Court of Appeals upheld the constitutionality of subdivision 3 of section 111 of the Domestic Relations Law, which provides, under a blanket rule, that the consent of the father of a child born out of wedlock is not required for the adoption of his child.

The majority, under the guise of "best interests", has interpreted section 111-a to require a finding of unfitness of the natural father as a condition to the adoption of the child by a stranger. The basis of the majority's decision is apparently the disparity between the yearly income of the natural father and that of the proposed adoptive father. While conceding that "the child presently enjoys the trappings and benefits of a family unit created by the natural mother and her spouse," and that the natural mother "genuinely loves her son", they point out that the natural father has also exhibited a strong love for the child, and has, since 1972, provided voluntary financial support approximating $16,000.

They further note that the order of adoption would preclude the child from sharing in any "intestate descent and distribution of real and personal property" of his natural father, who earns a "fairly substantial income". The appellant's net yearly salary is $30,000. He is presently married for the second time, and has a son, who is 22 years of age, from a first marriage.

Any assumptions made as to the child's rights in case of intestacy are speculative in view of the appellant's marital situations. Also, at the time of the hearing, the mother had refused to accept support from the appellant for a period of six months.

The record further establishes that the natural parents and the child resided as a family unit for only eight months and that, since 1972, custody of the child has been with the mother, in New York State. The natural father has continuously resided in California. He never sought custody and did not institute filiation proceedings until 1977, after the marriage of the mother. The order of paternity does not direct the payment of support, and any such payments are therefore voluntary and terminable at will.

In 1976 the mother agreed to let the child visit with his natural father in California for one month. At the hearing she testified that the appellant kept the child longer than agreed to, and that the child was not permitted to speak to her by phone, as promised. She stated that the child was extremely upset over the prolonged separation from her and that she was forced to travel to California, where she took physical custody of the child.

The mother and her husband both testified that the child enjoys a loving relationship with the husband. The testimony of school personnel indicates that the child is happy and well-adjusted in his present situation. The husband is willing to undertake the support of the child for life. Both the mother and her husband are presently employed. Since September, 1976 the mother has severed all ties between the child and his natural father. On one occasion the child ran away from his father when the latter attempted to approach him.

In *Matter of Bennett v Jeffreys* (40 NY2d 543, 549), the Court of Appeals stated the following with respect to a "best interests" determination: "The child's 'best interest' is not controlled by whether the natural parent or the nonparent would make a 'better' parent, or by whether the parent or the nonparent would afford the child a 'better' background or superior creature comforts. Nor is the child's best interest controlled alone by comparing the depth of love and affection between the child and those who vie for its custody. Instead, in ascertaining the child's best interest, the court is guided by principles which reflect a 'considered social judgment in this society respecting the family and parenthood' *(Matter of*

*Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196, 204, *supra).* These principles do not, however, dictate that the child's custody be routinely awarded to the natural parent (see *Matter of Benitez v Llano,* 39 NY2d 758, 759)." The rule that a natural parent cannot be deprived of his right to his child absent a finding of unfitness has been espoused in the area of custody dispositions (see *Matter of Bennett v Jeffreys, supra).* Here, however, the fitness of the mother and her right to custody are not in issue.

In *Matter of Malpica-Orsini* (36 NY2d 568, 575, *supra),* the Court of Appeals stated: "The welfare of a child is a legitimate State interest and the State has a wide range of power for limiting parental freedom and authority in matters affecting the child's welfare *(Prince v Massachusetts,* 321 US 158, 167). As outlined, that interest is promoted by securing a normal home for a child and that interest is served by the statute under scrutiny. The inferior classification of the father of the child born out of wedlock bears a significant relationship to the recognized purpose which section 111 of the Domestic Relations Law commendably serves. Without it, the chances that such a child will have the equal rights and benefits of a home will be immeasurably diminished and the likelihood that he or she will be a pawn for the avaricious and embittered will be greatly enhanced."

Although the majority attempts to distinguish *Malpica-Orsini* on its facts, that decision specifically set forth a blanket rule, as noted before, for the following reasons (p 576): "To contend that at least some of the fathers of children born out of wedlock should be accorded the option or veto of consent is meaningless as far as ameliorating the problem. To grant this right to those who acknowledge paternity would require a most difficult search and constant inquiry. To extend it to those who have contributed to the support of the child would be an excursion into relative values difficult of proof. To allow it for fathers adjudicated to be such in compulsory proceedings would not alleviate the situation measurably since they are likely to be resentful and their legally enforced nexus with the child bears no relationship to their entitlement. The mere possibility of a presently existing right on the part of even some fathers, or one that might be acquired at a later date, no matter how restrictive the group to whom the right granted may be, is enough to discourage a wide range of prospective placements and adoptions."

Recently, in *Quilloin v Walcott* (434 US 246), the Supreme Court faced the issue of the constitutionality of Georgia's adoption laws, which similarly deny an unwed father authority to prevent adoption of his out-of-wedlock child. There the natural father attempted to stop an adoption by the mother and her husband, and to secure visitation rights, but did not seek custody of his child. The adoption was granted over his objection. In affirming the judgment granting the adoption, the Supreme Court stated (p 255): "We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' *Smith v Organization of Foster Families*, 431 U.S. 816, 862-863 (1977) (STEWART, J., concurring in judgment). But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, was in the 'best interests of the child.' "

The Supreme Court further found that the natural father had never undertaken the responsibility of daily supervision of the child, and that (p 256) "legal custody of children is, of course, a central aspect of the marital relationship, and even a father whose marriage has broken apart will have borne full responsibility for the rearing of his children during the period of the marriage".

The majority has, in my opinion, ignored the purposes underlying the promulgation of the statute (Domestic Relations Law, §§ 111, 111-a), and recent decisional law in this area, in blocking the adoption in the present case. Accordingly, I find that the Family Court properly dismissed the natural father's objections to the adoption.

MOLLEN, P. J., and RABIN, J., concur with SUOZZI, J.; TITONE, J., dissents and votes to affirm the order, with an opinion.

Order of the Family Court, Orange County, dated August 11, 1977, reversed, on the facts, without costs or disbursements, and appellant's objections to the proposed adoption are sustained.