Cooke, J.
Relying solely on the claimed unconstitutionality of subdivision 3 of section 111 of the Domestic Relations Law, pertaining to the consent required for adoption of a child born out of wedlock, appellant appeals directly from a Family Court order of adoption.
Heather Alison Malpica-Orsini was born out of wedlock to Corrine Caberti on November 16, 1970. Appellant Hector Orsini lived with the child and her mother until June, 1972. On September 8, 1972, in a proceeding in which appellant admitted paternity, an order was entered in Family Court, New York County, adjudging appellant to be the father of the child and, pursuant to agreement, directing the payment by him of a monthly sum for support and granting to him visitation rights.
In February, 1973, Corrine Caberti married respondent Charles Blasi, and on June 21, 1973, respondent filed a petition in Family Court, Westchester County, praying for approval of his adoption of the child and alleging his marriage to the natural mother. Appellant then moved in said proceeding for an order enforcing his visitation rights as set forth in the filiation order, granting him notice and an opportunity to be heard in all proceedings concerning his daughter and dismissing the petition for adoption. He contended therein that subdivision 3 of section 111 of the Domestic Relations Law, which limits consent to the adoption of a child born,out of wedlock to the natural mother, is unconstitutional in that it violates the due process and equal protection clauses of the United States Constitution by unjustly discriminating between fathers of children born out of wedlock and all other parents. *570 The application was terminated in an order directing that appellant be granted notice and opportunity to be heard at all proceedings concerning his daughter and that force and effect be given to his objections to said adoption. Dismissal of the petition for adoption was denied. Thereafter, following a hearing at which appellant appeared and was represented by counsel, an order was entered allowing and approving the proposed adoption and denying appellant’s objection.
The right to adoption of children and strangers to the blood, while known to ancients such as those of Greece and Rome and recognized by different continental nations under the civil law, was unknown to the common law and exists only by statute (Betz v Horr, 276 NY 83, 86-87; Carpenter v Buffalo Gen. Elec. Co., 213 NY 101, 104; Matter of MacRae, 189 NY 142, 143; Matter of Thorne, 155 NY 140, 143). The Legislature has supreme control over the subject (Carpenter v Buffalo Gen. Elec. Co., supra, p 107; Matter of Cook, 187 NY 253, 260), and article 7 of the Domestic Relations Law defines the persons who may adopt another, prescribes the procedure to be followed and provides that no person shall be adopted except in pursuance thereof (§ 110; see Matter of Cohen, 155 Misc 202, 205).
Since adoption is purely a statutory matter ("Doe” v "Roe”, 37 AD2d 433, 436; Caruso v Caruso, 175 Misc 290, 291), the answer to the question of what consents are necessary must be found in the statutory provisions. Section 111 of the Domestic Relations Law, subject to limitations set forth therein and not applicable here, requires the consent of the parents or surviving parent of a child born in wedlock (subd 2) and of the mother of a child born out of wedlock (subd 3). The statute is explicit that no consent is required of the father of a child born out of wedlock (Matter of Brousal, 66 Misc 2d 711, 712).
We approach the constitutional testing of this statute with certain well-established principles in mind: that a legislative enactment carries with it an exceedingly strong presumption of constitutionality; that, while this presumption is rebuttable, unconstitutionality must be demonstrated beyond a reasonable doubt; that every intendment is in favor of the statute’s validity; that the party alleging unconstitutionality has a heavy burden; and that only as a last resort will courts strike down legislative enactments on the ground of unconstitutionality. Nor may courts substitute their judgment for that of the Legislature as to the wisdom and expediency of the legislation.
*571 There is a further presumption that the Legislature has investigated and found facts necessary to support the legislation (I.L.F.Y Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269), as well as the existence of a situation showing or indicating its need or desirability (Matter of Van Berkel v Power, 16 NY2d 37, 40). Thus, if any state of facts, known or to be assumed, justify the law, the court’s power of inquiry ends (Matter of Spielvogel v Ford, 1 NY2d 558, 562, app dsmd 352 US 957).
Under the doctrine of separation of powers, courts may not legislate (Bright Homes v Wright, 8 NY2d 157, 162; Matter of Metropolitan Life Ins. Co. v Boland, 281 NY 357, 361), or rewrite (Matter of Chase Nat. Bank v Guardian Realties, 283 NY 350, 360; Matter of Tormey v LaGuardia, 278 NY 450, 451), or extend legislation (People ex rel. Newman v Foster, 297 NY 27, 31; Matter of Hogan v Supreme Ct., 281 NY 572, 576). If consent is to be required of the father of an out-of-wedlock child, that is a matter for the Legislature. The courts have no right to expand the terms of the instant statute.
In measuring appellant’s claim of a denial of equal protection, it is necessary to consider various standards of review. It has been observed that there is hardly a law on the books that does not affect some people differently from others (see San Antonio School Dist. v Rodriguez, 411 US 1, 60 [concurring opn]). Under traditional analysis, the equal protection clause does not deny to States the power to treat different classes of persons in different ways, but a classification must be reasonable, not arbitrary, and have a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike (Reed v Reed, 404 US 71, 75-76; Neale v Hayduk, 35 NY2d 182, 186). A State does not violate the guarantee merely because the classifications made by its laws are imperfect (Dandridge v Williams, 397 US 471, 485), and a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it (McGowan v Maryland, 366 US 420, 426; Matter of Dorn "HH” v Lawrence "II”, 31 NY2d 154, 158).
Adoption laws in the United States are founded upon broad humanitarian principles and the public policy involved in_the statutes is one of beneficence (2 Am Jur 2d, Adoption, § 3). Embodied in our adoption statute is the fundamental social concept that the relationship of parent and child, with all the personal and property rights incident to it, may be estab *572 lished, independently of blood ties, by operation of law, and that has been part of the public policy of this State since 1887 (Domestic Relations Law, § 117; Matter of Upjohn, 304 NY 366, 373). In harmony with the legislative policy thus expressed, the adoption statute has been most liberally and beneficiently applied (Matter of Upjohn, supra).
Adoption is a means of establishing a real home for a child (see Schatkin, Disputed Paternity Proceedings [3d ed], p 119). In "Adopting a/Child Today” (1965) by Isaac, described by the National Council of Adoptive Parents Organizations as being "far and away the best book on adoption, foster care, and related subjects in the field,” it is stated at pages 210-211: "Adoption has always had the dual function of giving children homes and homes children * * * The emphasis is now on promoting the welfare of an otherwise homeless child. This change is partly the result of the increasing importance of psychiatry and psychology, which have revealed the role of a happy family life in producing well-adjusted citizens, and partly the inevitable response to a totally changed situation. Illegitimacy and family breakdown have become problems on an unprecedented scale in modern industrial societies. Never before have there been so many thousands of children for whom society finds each year that it must make some provision. * * * the purpose of adoption is almost uniformly seen as promoting the welfare of children.”
To require the consent of fathers of children born out of wedlock (see General Construction Law, § 59), or even some of them, would have the overall effect of denying homes to the homeless and of depriving innocent children of the other blessings of adoption. The cruel and undeserved out-of-wedlock stigma would continue its visitations. At the very least, the worthy process of adoption would be severely impeded.
Great difficulty and expense would be encountered, in many instances, in locating the putative father to ascertain his willingness to consent. Frequently, he is unlocatable or even unknown. Paternity is denied more often than admitted. Some birth certificates set forth the names of the reputed fathers, others do not.
Couples considering adoptions will be dissuaded out of fear of subsequent annoyance and entanglements. A 1961 study in Florida of 500 independent adoptions showed that 16% of the couples who had direct contact with the natural parents reported subsequent harassment, compared with only 2% of *573 couples who had no contact (Isaac, Adopting a Child Today, pp 38, 116). The burden on charitable agencies will be oppressive. In independent placements, the baby is usually placed in his adoptive home at four or five days of age, while the majority of agencies do not place children for several months after birth (p 88). Early private placements are made for a variety of reasons, such as a desire to decrease the trauma of separation and an attempt to conceal the out-of-wedlock birth. It is unlikely that the consent of the natural father could be obtained at such an early time after birth, and married couples, if well advised, would not accept a child, if the father’s consent was a legal requisite and not then available. Institutions such as foundling homes which nurture the children for months could not afford to continue their maintenance, in itself not the most desirable, if fathers’ consents are unobtainable and the wards therefore unplaceable. These philanthropic agencies would be reluctant to take infants for no one wants to bargain for trouble in an already tense situation. The drain on the public treasury would also be immeasurably greater in regard to infants placed in foster homes and institutions by public agencies.
Some of the ugliest disclosures of our time involve black marketing of children for adoption. One need not be a clairvoyant to predict that the grant to unwed fathers of the right to veto adoptions will provide a very fertile field for extortion. The vast majority of instances where paternity has been established arise out of filiation proceedings, compulsory in nature, and persons experienced in the field indicate that these legal steps are instigated for the most part by public authorities, anxious to protect the public purse (see Schaschlo v Taishoff, 2 NY2d 408, 411). While it may appear, at first blush, that a father might wish to free himself of the burden of support, there will be many who will interpret it as a chance for revenge or an opportunity to recoup their "losses”.
Marriages would be discouraged because of the reluctance of prospective husbands to involve themselves in a family situation where they might only be a foster parent and could not adopt the mother’s offspring.
We should be mindful of the jeopardy to which existing adoptions would be subjected and the resulting chaos by an unadulterated declaration of unconstitutionality. Even if there be a holding of nonretroactivity, the welfare of children, placed in homes months ago, or longer, and awaiting the *574 institution or completion of legal proceedings, would be seriously affected. The attendant trauma is unpleasant to envision.
Certainly, these facts demonstrate that the classification is reasonable, not arbitrary, and, keeping in mind the paramount consideration of a child’s welfare, the legislative action is justified.
Although, in some cases, the Supreme Court has not clearly articulated the equal protection standard to be applied in cases involving illegitimate children, considerable clarification has evolved from Weber v Aetna Cas. & Sur. Co. (406 US 164), which reviewed a challenge to a Louisiana workmen’s compensation statute granting legitimate children a prior claim to recovery over illegitimates. It was held at pages 172-173: "The tests to determine the validity of state statutes under the Equal Protection Clause have been variously expressed, but this Court requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose. Morey v Doud, 354 US 457 (1957); Williamson v Lee Optical Co., 348 US 483 (1955); Gulf, Colorado & Santa Fé R. Co. v Ellis, 165 US 150 (1897); Yick Wo v Hopkins, 118 US 356 (1886). Though the latitude given state economic and social regulation is necessarily broad, when state statutory classifications approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny, Brown v Board of Education, 347 US 483 (1954); Harper v Virginia Board of Elections, 383 US 663 (1966). The essential inquiry in all the foregoing cases is, however, inevitably a dual one: What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?” Continuing, it was stated at pages 175-176: "The status of illegitimacy has expressed through the ages society’s condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent. Courts are powerless to prevent the social opprobrium suffered by these hapless children, but the Equal Protection Clause does enable us to strike down discriminatory laws *575 relating to status of birth where—as in this case—the classification is justified by no legitimate state interest, compelling or otherwise.”
As pointed out in a Comment, entitled "Illegitimacy and Equal Protection” (49 NYU L Rev 479), the Weber decision is an extremely important one in two respects (pp 485-486):
"First, it marks one of the most overt attempts by the Court to escape the rigid two-tier framework of equal protection analysis within which all cases, as Levy [391 US 68] and Glona [391 US 73] amply illustrated, could not be meaningfully managed. Instead of focusing debate on the outcome-determinative question of the characterization of the interests at stake, Justice Powell’s formulation of the equal protection question centers on the merits of the particular controversy at hand. It appears to allow a realistic examination of conflicting policies and interests in a challenged statute without resort to the tired formulations and stock responses which the two-tier approach automatically invokes.
"Second, the Court’s discussion of the competing interests in this controversy is by far the most informative of all the illegitimacy opinions. Though far from comprehensive, it contains enough discussion to facilitate an understanding of the reasoning which led to the holding. Thus it provides a starting point for analysis of other opinions and other controversies.” Weber has been followed and cited in subsequent Supreme Court decisions, i.e., New Jersey Welfare Rights Organization v Cahill (411 US 619) and Gomez v Perez(409 US 535).
The welfare of a child is a legitimate State interest and the State has a wide range of power for limiting parental freedom and authority in matters affecting the child’s welfare (Prince v Massachusetts, 321 US 158, 167). As outlined, that interest is promoted by securing a normal home for a child and that interest is served by the statute under scrutiny. The inferior classification of the father of the child born out of wedlock bears a significant relationship to the recognized purpose which section 111 of the Domestic Relations Law commendably serves. Without it, the chances that such a child will have the equal rights and benefits of a home will be immeasurably diminished and the likelihood that he or she will tje a pawn for the avaricious and embittered will be greatly enhanced. Following the decision in Stanley v Illinois (405 US 645), Ursula Gallagher, an adoption specialist in the Department. of Health, Education and Welfare, in expressing appre *576 hension, observed: "The new legalities would mean that many of these children [available for adoption] will spend their early lives in foster homes”; and Dr. Ner Littner, psychiatric consultant to agencies in Chicago, said: "We know today that keeping a baby in a boarding house can cripple him emotionally” (Fathers’ Rights—Supreme Court Rulings on Adoption Complicate the Placing of Children, Wall Street Journal, July 9, 1972, p 1, col 1).
To contend that at least some of the fathers of children born out of wedlock should be accorded the option or veto of consent is meaningless as far as ameliorating the problem. To grant this right to those who acknowledge paternity would require a most difficult search and constant inquiry. To extend it to those who have contributed to the support of the child would be an excursion into relative values difficult of proof. To allow it for fathers adjudicated to be such in compulsory proceedings would not alleviate the situation measurably since they are likely to be resentful and their legally enforced nexus with the child bears no relationship to their entitlement. The mere possibility of a presently existing right on the part of even some fathers, or one that might be acquired at a later date, no matter how restrictive the group to whom the right granted may be, is enough to discourage a wide range of prospective placements and adoptions.
Stanley v Illinois (405 US 645, supra), relied upon by appellant, does not compel or even indicate a determination of unconstitutionality of section 111 of the Domestic Relations Law, insofar as said section dispenses with the consent of the father of a child born out of wedlock while at the same time requiring such a consent on the part of the father of a child born in wedlock. That custody case involved an unwed father who lived with the mother of three children intermittently for 18 years and whose children, on the mother’s death, were declared State wards and placed in guardianship under Illinois statutes, which provided that children of unmarried fathers, upon the death of the mother be declared dependents without any hearing on parental fitness and without proof of neglect, though such hearing and proof were required before the State assumed custody of children of married or divorced parents and unmarried mothers. The State of Illinois contended that unwed fathers were presumed unfit to raise their children and that it was unnecessary to hold individualized hearings to determine whether particular fathers were in fact *577 unfit parents before they were separated from their children. The Supreme Court concluded that (p 649), "as a matter of due process of law, Stanley was entitled to a hearing on his fitness as a parent before his children were taken from him and that, by denying him a hearing and extending it to all other parents whose custody of their children is challenged, the State denied Stanley the equal protection of the laws guaranteed by the Fourteenth Amendment”.
Due process was not lacking here. Although this was an adoption proceeding, appellant Orsini, having been given notice by court direction, the right to object and a full hearing with representation by an attorney, was not deprived of due process (see Domestic Relations Law, § 111). At the hearing, it was stipulated that "if the parties were called to testify that the Court would have sufficient facts before it, other than abandonment or other waiver of rights by Mr. Orsini, to exercise its discretion to deny his objections and approve the adoption on the grounds that the overall best interest of the child would warrant it”.
In this specific case, there are allegations in the record that appellant was "seriously in default in payments” under the 1972 Family Court order, that when the mother applied for welfare support she was told she would have to file a petition alleging paternity, that he was given to "violent rages”, that on two occasions he tore a telephone off the wall, that he ripped all the electric wires out of the mother’s car and threatened to take the child and disappear so the mother could never see her.
Neither was there a denial of equal protection in this matter. In Stanley, the court found no basis for the classification which resulted in the absence of notice and hearing to appellant. Orsini’s rights were protected by the notice and hearing. In the instant case, there are several compelling reasons supporting a different legislative classification, tested even under different standards, for fathers of children born out of wedlock, so as to justify a denial to them of such a powerful veto over adoptions of illegitimate children—indeed over their welfare—which should be the primary public concern (see 70 Mich L Rev 1581, 1611). The proper course was followed here by centering the review on the merits of the controversy at hand and by conducting a realistic examination of the conflicting policies and interests involved in the chai *578 lenged statute—without the straitjacket of the two-tier approach with its "tired formulations” and "stock responses”.
Of course, the primary concern of the Legislature and the courts is with the welfare of the children involved rather than with the allocation of rights between the mother and the usually uncertain and reluctant father of the children born out of wedlock. In this context, legislation and policy are governed by general conditions rather than the special circumstances of a sympathetic and idiosyncratic situation. Moreover, as noted earlier, the father in this case was given notice and an opportunity to be heard on the issue of what was in the best interest of the child.
Judicial interference with the wisdom exercised by the Legislature in this regard is not warranted.
The judgment of the Family Court, Westchester County, should be affirmed, without costs.