Millard L. Midonick, S.
The Spence-Chapin Service for Families and Children petitions this court for an order committing the custody and guardianship of the person of Tyease "J”, a female infant born out of wedlock on April 27, 1970, to the agency for the purpose of adoption. The court ordered a hearing since the natural mother objected to the commitment *1045 to the agency, which alleged that the natural mother had abandoned the infant, according to sections 371 and 384 of the Social Services Law. The rights of the natural father do not present any problem in this infant’s case.
At the hearing on July 29, 1975, a guardian ad litem, appointed by this court, appeared as attorney for the child, pro bono. Although the court informed the natural mother, 22 years old, that she could obtain legal representation without charge and urged her to do so, the natural mother declined such help, preferring to represent herself.
The natural mother never married, conceived her first child, before the one here involved, at age 13 and gave birth at age 14. The maternal grandmother has cared for this child since its birth and receives financial support for her from the Department of Social Services. The infant with whom the court is now concerned, has still another sibling one and a half years of age, who has always lived with the maternal grandmother and natural mother.
Tyease "J” was born to the natural mother when she was 17 years of age and while respondent mother was under supervision of the Family Court as a "person in need of supervision”. At that time, the maternal grandmother had requested the Family Court to study her respondent daughter who was a runaway. On or about the 4th day of June, 1970, at age less than six weeks, petitioner received this child who has been in foster care with the same foster parents since that time, virtually her entire life.
During the entire life of Tyease "J” there were only three visits by the natural mother when she actually saw her child, until this court confronted mother with child in chambers during this proceeding. The child does not recognize the mother. Agency records reveal that substantial efforts were made by petitioner to speak with both natural mother and grandmother about plans for this infant when very young. Respondent mother testified that her negative reaction to the petitioner’s attempts to strengthen the parental ties, was a result of the social worker’s seemingly unsympathetic attitude. At the hearing, it became evident that, since her early years, respondent has viewed parental figures as unsympathetic to her needs and desires and as imposing upon her unwarranted supervision. Petitioner’s social workers became parental figures in the eyes of this natural mother and as such were rejected by her.
*1046 On May 23, 1973, a foster care review proceeding was heard in Family Court under section 392 of the Social Services Law. Respondent failed to attend the hearing. Upon the basis of the hearing, the Family Court Judge decided that steps be taken to free the child for adoption. The court determines that the last visit between the respondent mother and this daughter (until a few weeks ago when they met as part of these current court proceedings) took place on May 11, 1971 and that the mother has not visited her or contributed to the support of her daughter, without good reason, for a period in excess of six months prior to the date of the petition for commitment— indeed she has never supported this child despite availability of welfare help, and her part-time employment at one period. The maternal grandmother of the infant Tyease testified that she is a licensed foster parent, that the respondent has been living with her for almost all of her life, and that she, the infant’s grandmother, offered the mother help to obtain custody and to give her home to Tyease and Tyease’s mother over the whole five years of Tyease’s life. The respondent mother never acted despite this simple plan and opportunity. Her abandonment is thus clearly apparent because she had no "good reason” to fail to accept her mother’s help. If the commitment is granted, the foster parents, who wish to adopt Tyease, can do so in a matter of weeks, in view of chapter 424 of the Laws of 1975.
Respondent testified, nevertheless, that at her current age of 22 she regards her right to obtain custody of her five-year-old as superior to any interference by agencies of the State, and superior to any right of the child to be shielded from alleged trauma of being shifted from her lifelong acquired family to her natural family. As of right, respondent from age 18 could have demanded welfare support for her child so that she could care for her child, but she never did. Respondent has had 12 years of schooling, has obtained employment in the past, and is capable of finding employment in the near future. She seems intelligent and capable enough to care for Tyease’s siblings with the assistance of the maternal grandmother, with whom she lives and who is herself a licensed foster parent.
However, these strengths of respondent, under the circumstances of prior abandonment, do not persuade the court to transfer Tyease to her natural mother, thereby not only destroying her chance for immediate adoption and thus a *1047 permanent home, but disrupting the home of her lifetime with her foster-adoptive parents. In a most searching opinion grounded upon painstaking scholarship, the Court of Appeals recently upheld the granting of an adoption to a petitioning stepfather on the urging of the natural mother, his wife, over the vigorous objection of the natural out-of-wedlock father. The infant, also born in 1970, as was Tyease in the matter before us, had always resided with the natural mother in the adoptive home, although the unmarried father had also resided in the infant’s home for the first two years of that child’s life (Matter of Malpica-Orsini, 36 NY2d 568). The majority of five Judges upheld the statutory distinction between the right of an unwed mother to veto an adoption (unless she had abandoned or is otherwise unfit under statutory provisions), and the lesser right of an unwed father not to veto, but merely to be heard on the issue of whether the adoption is in the best interests of his infant child.
No attorney appointed by any court appeared for that infant in Malpica-Orsini (supra); it is to be hoped that the Court of Appeals or the Legislature will shortly mandate such representation, as was provided in the case at bar. Without such representation, the natural parent vigorously focuses on parental rights and claims. The approach centers on whether "this child belongs to me”, without an equal inquiry, on behalf of the unrepresented infant on whether "this parent belongs to me”.
In protecting by adoption the lifelong home of the infant in Malpica-Orsini (supra), a most appropriate result, the Court of Appeals strained to uphold outmoded legislation which needs careful revision in view of recent decisions of the Supreme Court of the United States, particularly Rothstein v Lutheran Social Servs. of Wis. (405 US 1051). That case was remanded to the Supreme Court of Wisconsin, mandating that an unwed father be given his day in court to oppose adoption regardless of State statute, but cautioning that due regard must be given to the length of time that the infant has resided in the adoptive home. Ultimately, on retrial, the long-time adoptive home prevailed again. (State ex rel. Lewis v Lutheran Social Servs., 59 Wis 2d 1, 68 Wis 2d 36.)
While the Court of Appeals in Matter of Malpica-Orsini (supra) did protect the child’s lifelong home by affirming the adoption over the unwed father’s objection, nevertheless by dicta sustaining the entire outmoded legislative structure, the *1048 court did not question the veto rights of an innocent mother, even though she might in another case be opposed to the best interests of her infant to be adopted. In affirming that "the state has a wide range of power * * * in things affecting the child’s welfare (Prince v Massachusetts, 321 US 158, 167).” "[T]hat interest is promoted by securing a normal home for a child and that interest is served by the statute under scrutiny”, the court immediately went on to approve the "inferior classification of the father of the child born out of wedlock” (Matter of Malpica-Orsini, 36 NY2d 568, 575, supra).
Judges Jones and Fuchsberg, while not voting to disrupt this child’s permanent home, as the mother seeks to do in the case at bar, dissented from the granting of adoption on the ground that the unwed father should be given a veto unless he had abandoned his infant, which he had not done. The dissenters would raise the veto-right of the unwed father to the same level as that of the unwed mother (and wed parents).
It is the respectful hope of this court that all seven of the members of the Court of Appeals, and the Legislature as well, will indeed equate the rights of the mother and father, wed or unwed, but equate them downward to the level of the almost submerged rights of the infants. These infants of tender years have rights as human beings, rights of equal stature to those of their parents, rights that are emerging as of constitutional dimension, rights to a permanent home so fundamental as to negate any parent’s veto of adoption, statutory or otherwise, if the circumstances provide a factual showing strong enough. Thus, the dissenting opinion in which two of the New York Court of Appeals Judges joined, despite the wish to uphold the "veto” of adoption, properly urges "that more appropriate and selective procedures could have been found to satisfy the compelling State interest. * * * For instance, several States have adopted legislation authorizing the adoption court on an ad hoc basis in individual cases to dispense with the requirement of consent of a parent — father or mother, married or unmarried — when there has been an appropriate finding that insistence on such consent would not be in the best interests of the child” (Matter of Malpica-Orsini, 36 NY2d 568, 587). There is nothing in the majority opinion inconsistent with this view that the legislation should be improved; the majority merely finds the outmoded statute not in conflict with the United States Constitution. Hopefully our Legislature will revise our statute so that flexibility and constitutionality will *1049 converge in balancing the equities of fathers’, mothers’, and infants’ rights; the latter need the protection more than the maturer parents, and so the infants’ constitutional rights to a permanent, stable, suitable home would frequently be controlling over parental vetoes.
Dealing with our statute and the emerging national principles as we find them, as applied to the case at bar, this court must before granting custody of this young child for the first time in her five years of life to her mother, even if assisted by her maternal grandmother, consider whether such custody would result in a happy, stable environment for the child, and how long such a favorable adjustment would require. We must consider the trauma involved in removing the infant from foster parents, who have been continuously loving and attentive to her since the second or third month of her life. Although the trauma itself might or might not lead to permanent emotional damage, to subject such a child to so painful an experience, even though her despair at losing her only foster parents can be expected to be minimized in a year or two, seems definitely unjustified unless compelled by some necessity, in view of her mother’s abandonment of her. Whether this mother "intended” or not to waive her parental rights, she must in these circumstances of neglect, be found and is found to have intended the natural and probable consequences of her failure to act, and the child consequently does not know this respondent as a mother. The statute defines abandonment as failure to visit or support, without good reason, an infant child for six months; intention is not otherwise involved. (Matter of Jennifer "5” 69 Misc 2d 942, 951; Matter of Raana Beth N., 78 Misc 2d 105; Matter of Catherine ”G”, 79 Misc 2d 731; Goldsmith, Freud & Solnit, Beyond the Best Interests of the Child [1973], passim. Here, the constitutional rights of the respondent mother are superseded by those of the infant Tyease. The constitutional rights of the infant to a stable, permanent home cannot be disrupted by the mother’s desire to have her child for the first time after four years of inexcusable sleeping on her duties and on her rights. (Cf. Rothstein v Lutheran Social Servs. of Wis., 405 US 1051.) The Supreme Court of the United States is in the process of elevating the "best interests” of infants to constitutional dimensions no less compelling than those human rights of parents. This mother here is saying, in effect, "This child is mine, and the law must sustain me”; this child is saying *1050 through her lawyer, in effect, "This mother is not mine, I have always had other parents, and the law must sustain me.”
The court finds that respondent mother has abandoned Tyease according to sections 371 and 384 of the Social Services Law. This petition for commitment is therefore granted.
The foster parents of Tyease, the court has been led to believe, will adopt this child as soon as she has been freed by this commitment for the purpose of adoption. If, after six months from entry of this order of commitment, the child is still available for adoption, because these foster parents will not have yet adopted Tyease, the court will reopen the proceeding, at the request of the guardian ad litem of the infant, who is the only one to be notified. At such a time the court will be disposed to give leave to the natural mother and the infant for another day in court, if the guardian so advises of the failure to adopt in the permanent present home.