OPINION OF THE COURT
Lucille Polk Buell, J.
A petition dated March 29, 1980, seeks the adoption of an infant, Robin U., by Terry C. and Roger C. George R., the adjudicated father, objects to the proposed adoption. He was given notice and an opportunity to be heard at a hearing held on November 25, 1980. Attorney for Terry and Roger C. submitted a memorandum of law which was received by the court on January 8, 1981.
It is undisputed that Terry C. and George R. are the natural parents of the child, born July 20, 1977, and that they maintained an intimate relationship for a substantial period of time.
George R. was adjudicated the child’s father and was ordered to pay support of $10 per week by order of the Family Court, Orange County, dated January 25, 1978. This support was based upon his salary during this period of approximately $80 per week.
The parents’ close relationship continued for several months after the child’s birth and although marriage was discussed on numerous occasions, they did not marry because Terry C. wanted to finish high school. She testified that George R. threatened to commit suicide after their *829 relationship terminated, but this allegation was not supported by any proof.
Conflicting testimony was presented concerning the natural father’s relationship with the child. Petitioner Terry C. and her mother both testified that his relationship with the child was not close. They testified further that the natural father never volunteered any financial assistance and had in fact refused to pay the confinement expenses when requested by the maternal grandmother. Both testified that the child called his father by his first name and did not use any fatherly expression in referring to him.
The testimony of George R. and of several other witnesses, however, established that he was at all times a concerned and loving father. Prior to the termination of the parents’ relationship, the natural father saw the child almost every day and thereafter, until approximately March or April, 1980, visitation between the natural father and his child took place on a regular weekly basis and included occasional overnight and holiday visitation. The testimony also established that prior to the order of January 25,1978, George R.’s ability to support the child was questionable due to his most limited financial circumstances. He has purchased gifts for the child for his birthday and other occasions and maintained medical insurance for the child.
The natural father testified further that he owns a motorcycle, but does not belong to any organized motorcycle club. No proof was presented that the child was adversely affected in any way by his father’s ownership of a motorcycle.
Witnesses’ testimony also established that the relationship between the parents was generally known in the community and that the natural father held himself out to be the father of Robin U.
Terry C. subsequently met Roger C. and they were married on October 20, 1979. She admitted that she had denied the natural father visitation with his child during the Christmas, 1979, and Easter, 1980, holidays when visitation with the natural father had been scheduled. She also admitted that she denied the natural father all visitation *830 beginning in March or April, 1980, approximately the time of the filing of the instant application.
The natural father admitted that he unilaterally halted his ordered child support payments after Terry C. filed the instant application for adoption and cut off his visitation. He claimed this action was taken on advice of counsel. The court cannot condone his failure to comply with the support order, which was entered for the benefit of the child. However, the court is aware that, in ignorance of the law, this tactic has been used as a means of protest by both wed and unwed fathers when visitation is withheld. He is presently in arrears in his ordered child support payments.
In Matter of Malpica-Orsini (36 NY2d 568, app dsmd sub nom. Orsini v Blast, 423 US 1042) the Court of Appeals upheld the constitutionality of subdivision 3 of section 111 of the New York Domestic Relations Law. Under section 111, the natural mother’s consent was required for the adoption of a child born out of wedlock, but the consent of the natural father was not required regardless of his prior relationship with the child. The court found the natural father’s due process rights were not violated since he was given notice of the petition for adoption and was given the opportunity to present evidence at the hearing regarding the best interests of the child.
Section 111 was declared unconstitutional by the United States Supreme Court in Caban v Mohammed (441 US 380). The court concluded that (supra, p 394): “this undifferentiated distinction between unwed mothers and unwed fathers, applicable in all circumstances where adoption of a child of theirs is at issue, does not bear a substantial relationship to the State’s asserted interests.”
As a result of Cabcm, sections 111 and 111-a of the New York Domestic Relations Law relating to consents by and notice to the natural fathers of out-of-wedlock children were amended (L 1980, ch 575 [eff July 26,1980 except for two subd provisions not applicable herein]). Since this amendment became effective prior to this court’s decision, this matter must be decided on the basis of the law as it exists today. (Matter of Corey L v Martin L, 45 NY2d 383; Matter of Ray A. M., 37 NY2d 619; Matter of Michael F. C., NYLJ, Nov. 12, 1980, p 12, col 5.)
*831 The court in Caban did not conclude that all unwed fathers were entitled to equal treatment and did not question a State’s right to deny the right to veto an adoption to those unwed fathers who have abandoned their children. Further, the court suggested that a reasonable distinction might be drawn between the fathers of newborn children and the fathers of older children. “Even if the special difficulties attendant upon locating and identifying unwed fathers at birth would justify a legislative distinction between mothers and fathers of newborns, these difficulties need not persist past infancy. When the adoption of an older child is sought, the State’s interest in proceeding with adoption cases can be protected by means that do not draw such an inflexible gender-based distinction as that made in § 111.” (Caban v Mohammed, supra, at p 392.)
Reflecting this language, the amended section 111 does not equalize the rights of all fathers of children born out of wedlock with the rights of mothers of out-of-wedlock children. The new section 111 adds two categories of fathers whose consent to the adoption is required if certain enumerated conditions are met. One category is natural fathers of a child born out of wedlock and placed with the adoptive parents more than six months after birth (par [d]). The other category is natural fathers of a child born out of wedlock who is under six months of age at the time he or she is placed for adoption (par [e]). In the former category, the father’s consent to the adoption is required only if he “shall have maintained substantial and continuous or repeated contact with the child as manifested by: (i) the payment by the father toward the support of the child of a fair and reasonable sum, according to the father’s means, and either (ii) the father’s visiting the child at least monthly when physically and financially able to do so and not prevented from doing so by the person or authorized agency having lawful custody of the child, or (iii) the father’s regular communication with the child or with the person or agency having the care or custody of the child, when physically and financially unable to visit the child or prevented from doing so by the person or authorized agency having lawful custody of the child.” (Domestic Relations Law, § 111, subd 1, par [d].)
*832 The latter category requires the natural father’s consent only if the father “openly lived with the child or the child’s mother for a continuous period of six months immediately preceding the placement of the child for adoption; and (ii) such father openly held himself out to be the father of such child during such period; and (iii) such father paid a fair and reasonable sum, in accordance with his means, for the medical, hospital and nursing expenses incurred in connection with the mother’s pregnancy or with the birth of the child.” (Domestic Relations Law, § 111, subd 1, par [e].)
It might be questioned whether the limitations of section 111 are applicable in this proceeding since the child was never placed for adoption or placed with adoptive parents, but has resided since birth with the natural mother. The statutory distinctions between paragraphs (d) and (e) contemplate removal from or surrender by the natural parents and placement in an adoptive home. They establish guidelines for judicial determination based upon the child’s age on the date of placement for adoption or placement with adoptive parents.
However, the application of section 111 is appropriate in this proceeding since the rationale for the distinctions between paragraphs (d) and (e) is clear. There are pragmatic differences between the relationship of an unwed father with a newborn or very young child and the relationship of an unwed father with an older child. The unwed father of a newborn or very young child does not have the opportunity to establish an ongoing relationship with his child through substantial and continuous or repeated contact so that the quality of his relationship with the child’s, mother, his public acknowledgment of his fatherhood and his acceptance of financial responsibility for the newborn child’s birth must be used as indicia of his parental concern. The basic thrust of Caban, reflected in the new section 111 is that the court must distinguish between unconcerned fathers of out-of-wedlock children and concerned fathers who have accepted the responsibility of their child.
Since the child in this proceeding was older than six months of age on the date of the hearing, the court must *833 examine the natural father’s relationship with his child pursuant to the requirements set forth in paragraph (d). These guidelines logically apply in this proceeding since he had a substantial opportunity to establish, through his relationship with his child, whether he is a concerned father whose consent is required for the adoption of his child.
Since disposition of the instant case may be made within the framework of the statute, under the facts of this case the constitutionality of section 111 (subd 1, pars [d], [e]) was not an issue in this proceeding.
Substantial uncontroverted testimony was presented which established that the natural father openly held himself out to be the child’s father and that he maintained a close and loving relationship with his child since the child’s birth in 1977, including regular visitation and communication until approximately March or April, 1980, when visitation was cut off by Terry C. It was also uncontroverted that support ordered by the Family Court had been paid until his visitation was withheld. While the discontinuance of his support payments was improper, it is not controlling in light of the facts presented and is not evidence of the natural father’s abandonment of his financial responsibility toward his child. The court notes that both Terry C. and her mother emphasized his financial shortcomings yet, neither presented any testimony which would disprove the fact that he is a concerned, loving and understanding father.
Under all the circumstances, the court finds George R.’s consent to the adoption of Robin U. is required.
It is therefore ordered, that the petition for the adoption of Robin U. by Terry G. and Roger C. be, and hereby is dismissed.