OPINION OF THE COURT
Irving S. Aronin, J.
This is a declaratory judgment action tried before the court without a jury.
The plaintiffs consist of 29 licensed physicians in the State of New York, who are employed by Downstate Medi *320 cal Center College of Medicine (hereinafter Downstate), in Brooklyn, New York, to teach medicine. Downstate is operated, managed and controlled by the State University of New York (hereinafter SUNY).
The complaint asserts two causes of action. In the first, plaintiffs allege and seek a declaration that article 8-AA of the Education Law, entitled “Clinical Practice Income Management Corporations”, does not apply to fees for medical services rendered by the plaintiffs to their own private practice patients because such private practice is not related to their employment as teachers at Downstate. As a second and alternative cause of action, plaintiffs seek a declaration that if article 8-AA is found to be applicable to their private practice then said statute is unconstitutional and invalid on the dual grounds that it deprives the plaintiffs of property without due process of law and denies them equal protection of the law.
Article 8-AA was added to the Education Law in 1973 as sections 385-a through 385-i. A “Statement of legislative intent” is set forth in the statute as section 385-a. This section reads as follows: “It is the sense of the legislature that the current methods for the collection of, and accounting for, income generated by teaching professionals employed in a medical or dental school at a state university of New York medical center or health science center in the course of performing services related to their employment are inadequate and fail to serve properly the needs of the medical and dental schools, the state university system or the people of the state of New York. The purpose of this article is to provide a mechanism for the collection, management and ultimate disbursement, including disbursements for the purpose of making salary adjustments, of all such income and pursuant to which proper accounting and auditing measures may be implemented, and such purpose is hereby declared to be a public purpose, essential to the public interest.”
Other relevant provisions of article 8-AA include the following:
“§ 385-b. Definitions
“As used in this article, unless the context otherwise requires:
*321 “(a) ‘Clinical practice’ means the act of providing any form of medical and health care, including patient consultations, and the act of performing clinical investigation involving patients, for which acts a fee for professional services is customarily charged.
“(b) ‘Clinical practice income’ means all income resulting from fees charged for professional services rendered in connection with clinical practice, but shall not include research grants, royalties, honoraria for lectures or income from consultations unrelated to patient care.”
“§ 385-c. Restriction on clinical practice
“Notwithstanding any other law or the provisions of any agreement or contract, no employee serving in a position of academic rank in a medical or dental school at a state university of New York medical center or health science center having in operation a clinical practice income management corporation formed pursuant to this article may engage in any clinical practice except as a member of such corporation and in accordance with the provisions of this article and with the rules and procedures promulgated by the governing board of such corporation. For the purposes of this section, clinical practice at an affiliated institution shall be deemed to be clinical practice at a state university of New York medical or dental school. In addition to membership in the corporation, every such employee shall be a member of either a school-wide clinical practice plan or a clinical practice plan organized along one or more departmental lines. Selection of the plan structure shall be made on a departmental basis by vote of a majority of the members of the department. Membership in a corporation and a clinical practice plan shall, for the purposes of this chapter, be a condition of employment for any such employee who engages in clinical practice, except that the trustees may exempt from the provisions of this section such employees as are deemed to be engaged in part-time employment. Nothing herein shall prohibit the employment by the corporation of any member thereof.”
“§ 385-e. Purposes and powers of the corporation
“The purposes of the corporation shall be to collect, manage and disburse, on behalf of the medical or dental *322 school, all clinical practice income generated by employees of the school engaged in clinical practice in connection with their employment, and each corporation created pursuant to this article shall have the following powers:
* * *
“(g) To collect all clinical practice income generated by any of its members in accordance with a system established by the governing board and approved by the trustees and the state comptroller”.
In contrast to the plaintiffs’ position that their non-teaching-related private practice income is not encompassed within the definition of clinical practice income, the posture of the defendants is that it includes all of the doctors’ private practice fees. The plaintiffs’ position was upheld in a decision dated January 10, 1977 by a former Justice of this court, wherein he granted the plaintiffs’ motion for summary judgment, declaring that “Article 8-AA of the Education Law is applicable to only those services rendered by doctors in connection with their employment as teaching professionals at the SUNY Medical Colleges. This does not encompass, generally, the services rendered by the doctors, and the fees earned therefrom, to patients in their private practice” (Kountz v State Univ. of N. Y., 89 Misc 2d 483, 491).
Upon appeal of this decision, the Appellate Division, Second Department, reversed, holding that “a trial is necessary, at which the parties may present evidence, inter alia, of the intent of article 8-AA of the Education Law; the matters that it sought to correct or revise; and, to the extent that it may appear to be relevant, the relationship between the care of private patients by faculty professionals employed by SUNY and the performance by them of services related to their employment” (Kountz v State Univ. of N. Y., 61 AD2d 835, 836). This trial ensued.
Upon the trial the following testimony and documentary evidence was adduced:
Plaintiffs’ case consisted of the trial testimony of two of the plaintiffs, their pretrial depositions and those of two other plaintiffs, the reading into evidence parts of the deposition of one of defendants’ witnesses, and the submis *323 sion of various documents. The testimony and depositions of the four doctors disclose that their teaching duties include classroom lectures, conferences with students, making rounds examining patients in hospital wards and instructing students during these rounds, performing surgical operations and teaching and explaining such surgery to medical students who observe the operations, and research. The doctors also engage in a private practice between 8 and 20 hours a week. During some of this time, their students are observing and learning from the doctors’ treatment of their private patients. The doctors’ private practice fees in 1979 ranged from $50,000 to $120,000, which, in the case of each of the four doctors, is more than their teaching salary. The doctors generally see their private patients at the Downstate Medical Center, for which they pay $150 a year fee to Downstate.
The trial commenced with the plaintiffs reading from the deposition of one of the defendants’ witnesses concerning the intent of, and reason for, article 8-AA of the Education Law, the status of clinical practice at SUNY, the board of trustees’ 1959 resolutions relating to private practice income, and the January 3,1974 collective bargaining agreement between the State of New York and the union representing the doctors, and the relationship of said agreement to, and its differences from, article 8-AA. The various documents supporting each of the above were submitted into evidence.
In presenting their case, the defendants used the last referenced documents along with the testimony of defendants’ two witnesses to show the chronology of SUNY’s attempt at placing a limitation on their teaching professionals’ private practice income, commencing with the resolutions adopted by the board of trustees in 1959 (Resolutions 59-74 and 59-77). The chronology was continued with the agreement adopted on January 3, 1974 establishing the mechanism for a clinical practice plan, the discussions leading up to this agreement, the enactment of arti: ele 8-AA of the Education Law for the purpose of implementing said agreement and authorizing the creation of a nonprofit corporation as the administrative structure for the plan, and subsequent collective bargaining agreements *324 changing this administrative structure. It was stated that no clinical practice plan has ever been implemented at Downstate. There was also testimony that the care of private patients by the Downstate faculty doctors is an integral part of their over-all teaching obligations and that this private practice is performed almost exclusively at Downstate Medical Center. Further, it was said that almost 85% of the medical schools in the United States have clinical practice plans. This statement was supported by a report prepared by the Association of American Medical Colleges surveying these plans.
Upon all the testimony and other evidence presented, the court’s findings and conclusions are as follows:
With respect to the first two issues raised by the Appellate Division — viz., “the intent of article 8-AA of the Education Law” and “The matters that it sought to correct or revise” (Kountz v State Univ. of N. Y., 61 AD2d 835, 836, supra) — the court finds that the enactment of article 8-AA was intended solely to implement the January 3, 1974 agreement between the State and the union representing, inter alia, the teaching doctors. Apparently, it was believed necessary that the agreement be codified so as to authorize creation of a nonprofit corporation as the administrative entity for carrying out a clinical practice plan. It is the agreement, for example, and not the statute which provides for a 75% limitation on the amount of clinical practice income which can be distributed to the doctors under the plan (see infra).
In view of this limited function of article 8-AA, the more relevant inquiry is the intent and purpose of the January 3,1974 agreement providing for a clinical practice plan for the members of the medical faculty, and the previously adopted board of trustees’ resolutions.
Resolution 59-74 limits the doctors’ private practice income to only 50% of their base teaching salary, although as noted, neither this resolution nor any other resolution of the SUNY trustees specifies what shall be done with the excess income over the 50% limitation. It was testified to that SUNY promulgated this resolution in order to regulate the amount of time the doctors engaged in private *325 practice so as to ensure that they devote sufficient time to their teaching responsibilities. It was also stated, and this is supported by the previously mentioned report on clinical practice plans throughout the United States, that a restriction on income is more effective on a practical basis than placing a limitation on the amount of time devoted to private practice.
While this limitation on private practice income was never actually imposed on the doctors, its existence did, in part, cause a clinical practice plan to be included in the January 3, 1974 collective bargaining agreement. As the testimony discloses, this plan has a two-fold purpose: to provide for a higher level of fees from private practice — increasing it from 50% to 75% of base salary — which could be retained by the doctors; and secondly, to impose an improved administrative structure within which the clinical practice plan could be carried out. As to the latter, the union representing the doctors wanted an entity separate and apart from the university to administer the plan, in response to which a non-profit-making corporation was proposed and adopted.
In negotiating this agreement, the union objected to the all-inclusive proposed definition of clinical practice which would encompass all of the doctors’ patient care services including their own private practice. The union maintained that a distinction should be made between clinical practice income earned during clinical activities within the medical center and the doctors’ separate private practice, all of the fees from which the doctors had a right to retain. Unfortunately, however, this inquiry was not pursued any further and thus there was no testimony as to what happened during the course of negotiations to the union’s position on this issue. The end result, though, is that the agreement dated January 3, 1974 between the State of New York and the Senate Professional Association (the predecessor in interest to the doctors’ current union, the United University Professions) contains the all-inclusive definition of clinical practice. This definition reads in pertinent part as follows:
“Clinical practice shall mean the act of providing all forms of medical and health care including patient consul *326 tations and the act of performing clinical investigation involving patients, for which acts a fee for professional service is customarily charged * * *
“Commitment to academic responsibilities, instruction, and patient care necessarily extends beyond usual working hours. It is appreciated that no effort is being made to restrict an individual’s freedom • except that he should engage in no regular professional activity which would interfere with his commitment as a member of the faculty. Accordingly, except for unusual circumstances as determined by the Governing Board, or for consultation, clinical practice shall be restricted to facilities of the Health Sciences or Medical Centers and affiliated institutions.” Clinical practice income was then defined as follows in this 1974 agreement: “Clinical practice income shall mean the income resulting from fees for professional services which services are rendered in connection with clinical practice. Research grants, royalties, honoraria for lectures, and income from consultations, unrelated to patient care are not considered clinical practice income. Honoraria for lectures resulting from legally mandated continuing education for such purposes as certification and licensure shall not be excluded unless so agreed upon hereafter.”
Based on the all-inclusive language used in the agreement, the conclusion is inescapable that these definitions encompass all of a doctor’s private practice and his fees from such practice. This conclusion is consistent with the testimony elicited during the trial as to the third of the issues raised by the Appellate Division, “the relationship between the care of private patients by faculty professionals employed by SUNY and the performance by them of services related to their employment” (Kountz v State Univ. of N. Y., 61 AD2d 835, 836, supra). As noted earlier, it was stated that patient care is an integral part of a doctor’s teaching responsibilities. This is confirmed by the testimony of the plaintiffs’ witnesses and depositions that the doctors’ treatment of private patients is often observed by their students for teaching and instructional purposes as a part of their medical education.
Furthermore, this imposition of an income restriction on the teaching doctors’ private practice through the mecha *327 nism of a clinical practice plan is supported by the very telling and unrebutted testimony and documentary evidence that almost 85% of the medical schools in the United States, both public and private, utilize clinical practice plans with income limitations on the doctors’ private practice fees.
As members of the union which negotiated this voluntarily entered into collective bargaining agreement with the State of New York, the plaintiffs are bound by all of its provisions, including those pertaining to a clinical practice plan and the limitation on their private practice income (Antinore v State of New York, 49 AD2d 6, 10, affd 40 NY2d 921). The Appellate Division in Antinore (pp 10-11) set forth these applicable principles with respect to the union involved therein, the Civil Service Employees Association (CSEA): “CSEA, as designated bargaining agent for a group of public employees in which plaintiff was included, was agent for plaintiff, such that its assent to the agreement was plaintiff’s assent. ‘[T]he union represents all the employees as to all covered matters’ (Chupka v Lorenz-Schneider Co., 12 NY2d 1, 6). The fact that this plaintiff did not himself approve the agreement negotiated by his representative and now disclaims satisfaction with one aspect of the agreement makes it no less binding upon him. Labor relations involving any sizeable group cannot be expected to proceed only with the consent of each member of the group. Orderly process requires that agreements be made and complied with even in the face of minority dissent or disapproval. Plaintiff, as employee, has the benefits of the contract; he must accept also what he may regard as the disadvantages, for in the bargaining process it may well be that the latter were assumed in exchange for the conferral of the former. If plaintiff or others in his union are dissatisfied with their agents’ product, there are means available to effect a change in representation and certification (4 NYCRR Part 201). Meantime, he can no more claim exemption from the negotiated agreement than may a citizen, with impunity, withhold compliance with a statute because he disfavored his legislator’s affirmative vote on the enactment.”
*328 Article 8-AA of the Education Law adopts, almost verbatim, the all-inclusive definition of “clinical practice” (§ 385-b, subd [a]) and “clinical practice income” (§ 385-b, subd [b]) contained in the January 3, 1974 agreement. Other provisions of article 8-AA, however, seemingly condition these definitions with the words “related to their employment” (§ 385-a) and “in connection with their employment” (§ 385-e). (See supra for the full quotes of each of these sections.) It is this latter language, which does not appear in the 1974 agreement, which the plaintiffs are now relying upon to support their position in this case.
The evidence adduced at the trial discloses that it was the union that expressed concern that these “employment” phrases did not reflect the sense of the agreement in that it was not as broad as the more comprehensive definitions of clinical practice and clinical practice income. The union was advised that article 8-AA would be interpreted to implement the provisions of the agreement, which was the sole intent of the legislation.
The court likewise concludes that the all-inclusive unconditional definitions of clinical practice and clinical practice income in the January 3, 1974 agreement, as also incorporated in article 8-AA (see § 385-b, subds [a], [b]), are controlling and any interpretation of article 8-AA must be consistent therewith. Consequently, the employment-related" language found in sections 385-a and 385-e of article 8-AA is not to be construed as a modification of these definitions so as to exclude private practice income. Rather, said language more properly reflects the fact, as demonstrated by the credible evidence presented at the trial, that the doctors’ care and treatment of patients including those in their private practice is related to their teaching responsibilities.
Accordingly, with respect to the plaintiffs’ first cause of action, the court declares that article 8-AA of the Education Law, like the January 3, 1974 collective bargaining agreement which it was intended to implement, is applicable to all patient care services rendered by the teaching professionals (i.e., doctors) employed at a SUNY medical college, including the services rendered by the doctors, and *329 the fees earned therefrom, to patients in their private practice.
Turning now to the plaintiffs’ second cause of action, the court concludes that article 8-AA of the Education Law does not violate any of the plaintiffs’ constitutional rights.
A legislative enactment carries with it an exceedingly strong presumption of constitutionality and a party who is attacking the constitutionality of a statute has the heavy burden of establishing unconstitutionality beyond a reasonable doubt (Nettleton Co. v Diamond, 27 NY2d 182, 193; Matter of Malpica-Orsini, 36 NY2d 568, 570; Lighthouse Shores v Town of Islip, 41 NY2d 7, 11). Only as a last resort should a court strike down legislation on the ground of unconstitutionality (Matter of Malpica-Orsini, supra, p 570; Lighthouse Shores v Town of Islip, supra, p 11). While the law may not be arbitrary, it need only be reasonably related to some manifest evil which is reasonably apprehended (Lighthouse Shores v Town of Islip, supra, p 11). In order to succeed in this case, the plaintiffs have the burden of showing that no reasonable basis at all existed for the challenged portions of article 8-AA (Lighthouse Shores v Town of Islip, supra, p 11).
The plaintiffs have not met this burden nor have they established the statute’s unconstitutionality beyond a reasonable doubt. On the contrary, it is the defendants who have demonstrated that the enactment of a clinical practice plan and the inclusion of a teaching doctor’s private practice within the purview of said plan are reasonably and rationally related to the legitimate State and university interests of fostering full-time devotion to teaching duties (Gross v University of Tennessee, 448 F Supp 245, 248, affd 620 F2d 109, 110). It is not unreasonable to conclude that an excessive outside practice might interfere with these duties (Gross v University of Tennessee, supra, p 110). Moreover, the method adopted, i.e., placing a limitation on income rather than on the number of hours worked, is reasonably related to achieving this objective (supra, p 110). The widespread use of this type of regulation of private practice income at other medical schools in the country further supports these conclusions.
*330 Plaintiffs’ due process claim must be rejected. The “plaintiffs have no constitutional right to engage in the limited private practice of medicine while holding a public position of employment” as teachers at SUNY (Gross v University of Tennessee, supra, 448 F Supp, at p 248; cf. Trister v University of Mississippi, 420 F2d 499, 502).
Plaintiffs’ other contention of unconstitutionality, viz., that the provisions of article 8-AA deny to them the equal protection of the laws, is devoid of merit. Plaintiffs have the constitutional right to be treated by the State University in no significantly different manner from others who are members of the same class, i.e., members of the faculty of the SUNY medical schools (Trister v University of Mississippi, supra, p 502). However, they have not alleged that article 8-AA statutorily excludes any teaching doctors, nor have they shown that other licensed physicians on the faculty are not subject to its clinical practice plan requirements (Gross v University of Tennessee, supra, 620 F2d, at pp 110-111).
Under the traditional equal protection test, the classification of persons encompassed within the provisions of article 8-AA — to wit, the teaching professionals employed at the SUNY medical schools — has, as previously concluded, a reasonable basis and a substantial relation to the object of this statute (Reed v Reed, 404 US 71, 75-76; Matter of Malpica-Orsini, supra, 36 NY2d 568, 571, supra). Thus, the fact that other licensed physicians in the State are not similarly subject to the requirements of this legislation is irrelevant and does not serve to invalidate article 8-AA.
Accordingly, with respect to the plaintiffs’ second cause of action, the court declares that the provisions of article 8-AA are not unconstitutional for any of the reasons set forth in the complaint or contained in the plaintiffs’ posttrial memorandum.