Chief Judge Cooke
(dissenting). I am unable to view the procedure employed by the Family Court Judge in this case as acceptable in law or justice. I therefore respectfully dissent.
Critical in this case is the fact that the Family Court Judge actually knew, prior to signing the adoption order, that petitioner was claiming paternity and seeking visitation rights. Respondents informed the Judge on February 26, 1979 that petitioner had commenced a paternity proceeding in Westchester County. At that time, the Judge signed an order to show cause bringing on the respondent mother’s motion to change the venue to Ulster County so that the adoption and paternity proceedings could be held together. Petitioner first learned of the adoption proceeding when he was served with the order to show cause on Saturday, March 3,1979. Notwithstanding knowledge both that petitioner was formally claiming paternity and that the show cause order was returnable on March 12, the Judge, at the urging of respondents, signed the final adoption order on March 7. In his decision on petitioner’s motion to vacate the adoption order, the Judge justified his failure to give petitioner notice and an opportunity to be heard primarily on the ground that no statute specifically directed that notice be given to a putative father in petitioner’s position. The majority accepts this justification. I cannot.
There is no quarrel here with the majority’s conclusion *432 that Caban v Mohammed (441 US 380), which concerned a putative father’s right to consent to adoption, should not be given retroactive effect to an adoption proceeding concluded prior to that decision. The decision of the Supreme Court in that case, however, does not resolve all of the issues presented on this appeal. Under pre-Caban law, it was recognized that a putative father is entitled at least to notice and an opportunity to be heard concerning whether adoption would be in his child’s best interests (see Quilloin v Walcott, 434 US 246; Matter of Malpica-Orsini, 36 NY2d 568, 577-578, app dismd sub nom. Orsini v Blasi, 423 US 1042; Doe v Department of Social Servs. of City of Poughkeepsie, 71 Misc 2d 666; see, generally, Note, 22 William & Mary L Rev 85; Comment, 25 Villano va L Rev 317, 331, 337; Comment, 57 Denver LJ 671, 676-677). The conclusion that Caban is not retroactive, therefore, does not justify what I see as the total disregard of petitioner’s openly asserted right as a putative father to have at least some input into the decision that will remove the infant Jessica from his reach forever.
The course followed below is rationalized by the majority in part because petitioner, not having filed with the putative father registry (see Social Services Law, § 372-c) a notice of intent to claim paternity, among other things, did not come within any of the seven categories of putative fathers statutorily entitled to notice of an adoption proceeding under section 111-a of the Domestic Relations Law. Section 111-a was added in 1976 (L 1976, ch 665) in response to the Supreme Court’s decision in Stanley v Illinois (405 US 645). The statute was intended to “provid[e] clear constitutional statutory guidelines for notice to father’s of out-of-wedlock children” to accommodate the State’s interest in establishing finality in adoption proceedings and in developing an expeditious method for identifying those persons to whom notice must be given, and to give putative fathers, through creation of the registry, a simple means of communicating their interest in the child and protecting their right to be notified (Second Report of the Temporary State Commission on Child Welfare, bill jacket for chapter 665). From the history of section 111-a, it is evident that the Legislature was concerned with protecting *433 the interests of putative fathers while fostering prompt and final determinations in adoption proceedings.
The categories of fathers to whom notice must be sent under this statute generally further these ends by avoiding the requirement of extensive searches for unidentified or unknown putative fathers. And the putative father registry provides a centralized source, facilitating prompt location of the father. When, however, the father’s existence and his assertion of an interest in the child are actually known by the court hearing the adoption petition, the registry is redundant, as are the other sources of ascertaining the existence and location of the father enumerated in section 111-a. Slavish adherence to the “statutory guidelines” in such circumstances cannot have been intended by the Legislature. Indeed, the majority itself recognizes that the court could have required notice under subdivision 3 of section 111 of the Domestic Relations Law. In my view, then, the lack of specific statutory authority for affording an opportunity to be heard to one in petitioner’s position does not in any way justify the failure to give notice here.[1] The court’s power and responsibility to protect the interests of concerned parties cannot be so easily curtailed or circumvented (cf. Matter of Linda F. M., 52 NY2d 236, 240-241).
The majority here expresses some concern that if this court were to concede error in the lower court’s failure to give notice, a court would have to give notice any time it had actual knowledge of the identity of a particular putative father. Unlike the majority, I see nothing startling in such a requirement in circumstances similar to those present here.[2] Nor does such a proposition appear novel in light of *434 the pre-Caban decisional law recognizing that a putative father has a sufficient interest in his status as such at least to require giving him an opportunity to be heard on the best interest on the child.
The court in this case did not know merely that the biological father was an ascertainable person. The Judge knew that petitioner had undertaken affirmative, formal steps to establish his paternity and obtain visitation. Requiring notice under these circumstances simply does not open the door to notice claims by those out-of-wedlock fathers who have manifested no interest in parental status.
The majority also suggests that petitioner could have protected his rights by taking other steps once he learned the mother’s address[3] It is true that petitioner could have filed notice of intention to claim paternity as provided in section 372-c of the Social Service Law. But prior to March 3,1979, petitioner, with no knowledge that adoption by the mother’s husband was contemplated, had no reason to suspect that his rights were going to be permanently affected. Indeed, after locating the mother and being told to stay away from the family, petitioner, through his attorney, communicated with her on December 12, 1978 in an attempt to arrange visitation. A second attempt was made unsuccessfully in January, 1979. The paternity petition was thereafter filed at the end of that month; respondent mother received notice of the petition on February 22. The adoption proceeding had been commenced on December 21,1978. To say in the face of the actual knowledge of the Judge that petitioner could have protected his rights by filing a notice of *435 intent to claim paternity is to require the performance of a meaningless act. The filing of notice only assures that knowledge of the father’s existence can be readily ascertained. If it is already known by the court before the adoption order is signed, I am at a loss to discern what added benefit petitioner, or the State, could have obtained by filing such notice.
Nor am I able to characterize as untimely petitioner’s conduct after he became aware of the adoption proceeding. Notified on Saturday, March 3, that the adoption proceeding was pending, petitioner telephoned the Family Court Judge on the following Wednesday to inform him that an order to show cause for a stay of the adoption proceeding was to be submitted. The Judge in turn informed petitioner that the adoption order had been signed that morning. Given that the show cause order for the venue motion was returnable on March 12 and that the motion was predicated in part on a claim that the paternity and adoption proceedings should be held together, it borders on the absurd to characterize petitioner’s attempt to assert his interest in the adoption proceeding as anything but prompt.
Although the majority opines that any concern for the denigration of petitioner’s rights in this case arises only from hindsight in light of Caban, it is submitted that the majority’s tortuous route would not have been traveled had the specter of Caban, which the majority concedes would be applicable in the event of vacatur, not “emerged on the judicial horizon” (pp 429-430).[4] The disagreement with the majority expressed here is not meant to imply that the Family Court Judge acted out of animus toward petitioner or out of any motivation other than what he believed would *436 be in the best interests of Jessica. Well-intentioned motivations notwithstanding, the Family Court’s action cannot be termed anything but an abuse of discretion, either in signing the final adoption order or in refusing to vacate that order and reopén the proceedings.[5]
Simple justice requires according petitioner his day in court. Unable to concur in the majority’s determination that the Family Court’s decision was “the only prudent course of action to have followed in the best interests of Jessica” (p 430), I respectfully dissent.
Judges Jasen, Gabrielli and Meyer concur with Judge Jones ; Chief Judge Cooke dissents and votes to reverse in a separate opinion in which Judges Wachtler and Fuchs-BERG concur.
Order affirmed.

. I am unable to reconcile the majority’s conclusion that notice properly could have been required in the exercise of discretion under subdivision 3 of section 111 with its assertion that the Family Court Judge, had he required notice, would have acted contrary to the legislative determination not to include a putative father in petitioner’s position in the 111-a notice scheme. Having identified a statutory source of authority for giving notice, the majority nonetheless justifies the failure to give notice because of an absence of specific authority.

. Also unpersuasive is the majority’s concern that such a holding might form the basis of an argument that a natural mother’s failure to disclose the existence of a putative father would constitute fraudulent concealment of a *434 material fact. Whatever the motivations of a mother not to disclose the putative father’s existence, there may well be significant privacy interests that protect that decision and militate against compelled disclosure (see, generally, Note, 22 William & Mary L Rev, at p 127; Comment, 25 Villanova L Rev, at p 333, n 123; p 335). Those privacy interests simply are not present when the court has full knowledge of the putative father’s existence and assertion of parental status. Recognizing an obligation on the part of the court to act on facts before it simply does not require recognizing an obligation to disclose on the part of the mother.

. In his papers before the court, petitioner asserted that respondent mother had always recognized his paternity and had concealed her and Jessica’s whereabouts from shortly after Jessica’s birth in November, 1976 until August, 1978, at which point he learned that the mother had married.

. Although the majority appears convinced that under Caban petitioner automatically would have to be accorded the right to consent to the adoption, the reach of that decision remains unclear. The right to consent may well depend upon the substantiality of the family relationship between the putative father and the child (compare Caban, supra [consent required], with Quilloin, supra [consent not required] ; see, generally, Note, 22 William & Mary L Rev 85; Comment, 25 Villanova L Rev 317). Given the allegations that the whereabouts of the child were concealed from petitioner and the counterallegation of a lack of interest on petitioner’s part, it may be that factual questions in this case would have to be resolved before petitioner’s right to consent could be determined.

. The majority finds petitioner’s papers on the motion to vacate insufficient with respect to facts bearing on the best interests of Jessica. An inadequate showing, if such there be, might be relevant where the motion is addressed to the court’s discretion. Petitioner, however, seeks vacatur as a matter of right, specifically because he was denied the opportunity to present such facts in the first instance.