Meyer, J.
(dissenting). In my view the Legislature intended that equal dignity be accorded the right of a parent to raise her own child and the right of the child in its own best interests to a positive family relationship. Because the majority and the courts below apply a “diligent efforts” standard inconsistent with that intent and more stringent than the Legislature enacted, the affirmed finding of fact upon which the majority relies does not proscribe review by us, and on analysis of the record I conclude that there should be a reversal. I, therefore, respectfully dissent.
The legislative intent is explicitly stated in subdivision 1 of section 384-b of the Social Services Law. Paragraph (a) of that subdivision makes findings of the desirability of children growing up with a normal family in a permanent home, of the child remaining with his or her natural parent and the parent’s right to bring up their own children unless the best interests of the child would be endangered by their doing so, that the State’s first obligation is to help the family remain together or reunite, but that when the natural parent cannot or will not provide a normal family home for the child and continued foster care is not appropriate, a permanent alternative home for the child must be sought.
Paragraph (b) of the subdivision speaks to the adverse effects of long continued foster care and of the necessity for not only assuring parental rights but also for terminating them when necessary, in the following language:
“The legislature further finds that many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens. The legislature further finds that provision of a timely procedure for the termination, in appropriate cases, of the *567 rights of the natural parents could reduce such unnecessary stays.
“It is the intent of the legislature in enacting this section to provide procedures not only assuring that the rights of the natural parent are protected, but also, where positive, nurturing parent-child relationships no longer exist, furthering the best interests, needs, and rights of the child by terminating parental rights and freeing the child for adoption.”
It is against that background that we must construe paragraph (f) of subdivision 7 of the section which defines “diligent efforts” to mean “reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child” (emphasis supplied). Thus, though clauses (1) and (3) of paragraph (f) make clear that “diligent efforts” include planning for appropriate services to the child and his family and the provision of services and assistance to the parents in order to resolve or ameliorate the problems preventing discharge of the child from foster care, the agency complies with the “diligent efforts” standard if it makes reasonable attempts to provide the necessary services.
The Appellate Division majority wrote no opinion, contenting itself with affirmance on the opinion of the Family Court Judge. The Family Court Judge took no note of the words “reasonable attempts” in paragraph (f). She did note that the case record contained an October, 1973 psychiatric evaluation of borderline character disorder and psychotic symptomatology with the recommendation that respondent attend an after-care clinic before the children were returned to her, that the agency in May, 1974 reported its goal for respondent was for her to receive psychiatric treatment until she could care fqr the children and in March, 1975 indicated that it would encourage her to get treatment. She nevertheless concluded that diligent effort had not been made because she found the record “devoid of evidence that the agency made any efforts to obtain appropriate treatment for respondent” and “does not indicate when, if ever, the agency had any discussion with respondent regarding her need for psychiatric treatment.”
*568 Yet the record shows that after the June 17, 1975 reunion with her children, respondent met with the Director of Foster Care and the social worker, who recommended that she be evaluated by the agency’s psychiatric consultant and that respondent agreed with that recommendation and accepted an appointment for July 18, that despite the fact that a letter was sent on July 14 reminding respondent of the appointment, she failed to keep it, that she was told on October 17 that another reunion would not be scheduled until she had seen the doctor and agreed to another appointment on October 23, but on that date called the doctor and canceled the appointment. On December 18, 1975 respondent wrote the agency doctor and social worker advising that she had been in a New Jersey psychiatric hospital and asking that a new appointment be made for her with the agency doctor, yet when an appointment was scheduled for March 19, 1976, she canceled it and requested one for May or June. On April 15 the Director of Foster Care wrote respondent expressing concern that a permanent plan had not yet been made, that she had missed the 1975 and 1976 appointments with the agency doctor which were necessary “[to] help you to make the most appropriate plan for your children” and stressing how “extremely important” it was that she see the doctor on the new appointment date arranged, May 11. The psychiatric evaluation which occurred on May 11 resulted in a diagnosis of schizophrenia and the conclusion that it would be “very risky to have her youngest children return to her.” In October, 1976, the agency requested approval of the Bureau of Child Welfare to begin a termination proceeding. Approval was granted on March 4, 1977, but for reasons which do not appear from the record the fact-finding hearing was not held until June 12, 1979 and decision was not rendered until March 20, 1980.
At various times during the above chronology respondent was in South Beach Psychiatric Center, Ancora Hospital and Staten Island State Hospital and upon discharge was referred by the hospital for outpatient consultation. Prior thereto, in 1974, she had been in Kings Park State Hospital and at Elmhurst Hospital, all in relation to her mental condition. Hospitalized again in South Beach on *569 August 15,1977, where she was responding to medication, respondent in late September left on a hospital pass and never returned. The agency worker either wrote to or spoke with the personnel of the various hospitals in an effort to follow-up.
While the problem is, in good part, a result of a legislative standard which requires “diligent efforts” but defines those efforts in terms of “reasonable attempts,” I conclude with the dissenting Justices below that “diligent” and “reasonable” do not mean relentless. While respondent was being hospitalized for her mental problems the many times she was during the period in question and offered outpatient follow-up by them, the agency would have acted unreasonably had it sought to impose upon respondent a separate, different and possibly confusing regimen of consultation. That it did bring to respondent’s attention the necessity for treatment even to the extent of withholding visitation with the children and through correspondence, only to have respondent by one device or another delay for two years conference with the agency psychiatrist, is detailed above. To hold that what was done was not “diligent efforts” is to ignore the words “reasonable attempts” in the statutory definition,[1] to impose upon such agencies an impossible burden not intended by the Legislature, and to do so to the detriment of the children in foster care.
Stanley U. A. was born July 20, 1971 and Star A. on July 6,1972. They have been in foster care since November 2, 1972, and under appellant’s oversight since September 25, 1973. As the Supreme Court noted in Smith v Organization of Foster Families (431 US 816, 836, 837), “many children, particularly those that enter foster care at a very early age and have little or no contact with their natural parents during extended stays in foster care, often develop deep emotional ties with their foster parents” and experience “ ‘high rates of psychiatric disturbance.’ ” During the *570 four years from 1973 through 1977, respondent visited the children but nine times, canceling other visits on nine other occasions despite earlier confirmation. While expressing her unwillingness to free the children for adoption, respondent has several times suggested that they remain in foster care until they complete college, or otherwise indicated her indifference to them, an indifference which is emphasized by the Family Court Judge’s notation that “Respondent did not testify” and “failed to keep the appointments scheduled” for the psychiatric examination ordered by the court.[2]
As we noted in Matter of Orlando F. (40 NY2d 103, 111): “When the natural parent fails to accept the parental role, even though the result of shortcomings for which he or she may not be fully responsible, the ‘best interests’ of the child, the pivotal consideration underlying all of these proceedings, dictates that the right to custody be terminated.” Surrogate Midonick put it even more strongly in Matter of Tyease “J” (83 Misc 2d 1044, 1048), a decision of which the Legislature was presumably aware when it enacted section 384-b and its definition of diligent efforts: “These infants of tender years have rights as human beings, rights of equal stature to those of their parents, rights that are emerging as of constitutional dimension, rights to a permanent home so fundamental as to negate any parent’s veto of adoption, statutory or otherwise, if the circumstances provide a factual showing strong enough.”
An incorrect standard having been applied by the courts below, there should be a reversal and the matter should be remanded to the Family Court for a dispositional hearing.
Chief Judge Cooke and Judges Gabrielli, Jones and Wachtler concur in Per Curiam opinion; Judge Meyer dissents and votes to reverse in a separate opinion in which Judges Jasen and Fuchsberg concur.
Order affirmed, with costs.

. The Family Court Judge seized upon the caseworker’s testimony that because respondent would not take her medication and walked out of the hospitals in which she was being treated, efforts to refer her would have been “futile”. But the issue is not the word used by the caseworker or, as the majority in this court put it, “diligent efforts” as a matter of law, but whether the agency had made “reasonable attempts”, which is all that the statute requires.

. She was finally examined by a court psychiatrist before the hearing began but only to ascertain her competence to participate in the trial. During that examination she conceded that she had refused to appear for previously scheduled appointments for psychiatric examination.