Bellacosa, J.
(dissenting). Judges Simons, Titone and I respectfully dissent and vote to affirm in each case.
These appeals share a statutory construction issue under New York’s adoption laws. While the results reached by the majority are intended to have a benevolent effect on the individuals involved in these two cases, the means to those ends transform the legislative adoption charter governing countless other individuals. Additionally, the dispositional methodology transcends institutional limitations on this Court’s proper exercise of its authority, fixed by internal discipline and by the external distribution of powers among the branches of government.
The majority minimizes the at-will relationships of the appellants couples who would be combined biological-adoptive parents in each case, but the significant statutory and legally central relevancy is inescapable. Unlike married and single parent households, each couple here cohabits only day-to-day, no matter the depth or length of their voluntary arrangements. Their relationships lack legal permanency and the State has not endowed them with the benefits and enforceable protections that flow from relationships recognized under color of law. Nowhere do statutes, or any case law previously, recognize de facto, functional or second parent adoptions in joint circumstances as presented here.
Specifically, in the respective cases, the availability of adoption is implicated because of the operation-of-law consequences under Domestic Relations Law § 117 based on: (1) the relationship of the biological parent and the putative adoptive child if a male and female unmarried cohabiting couple, one of whom is the biological mother of the child, jointly petitions to adopt the five-year-old child; and (2) the relationship of the biological parent and her child if the lesbian partner of the biological mother petitions alone to adopt the five-year-old child. Neither *670 case presents an issue of ineligibility because of sexual orientation. or of discrimination against adoption on that basis, despite the majority’s evocations in that regard.
The facts are uncontested and pertinently recited in the Chief Judge’s opinion. In Matter of Jacob, Family Court, Oneida County, dismissed the petition on the ground that the petitioners are an unmarried couple. No best interests factual or evidentiary evaluations were undertaken. The court held that adoption proceedings are creatures of statute and that Domestic Relations Law § 110 does not authorize adoption by an unmarried couple. The Appellate Division, Fourth Department, affirmed (210 AD2d 876), concluding that the statute did not permit adoption by two unmarried persons together.
In Matter of Dana, Family Court, Putnam County, denied the adoption petition. The court held that (1) G. M. did not have standing to adopt pursuant to Domestic Relations Law § 110, since she did "not fall within any of the classifications under Domestic Relations Law Section 110”; and (2) the proposed adoption ran afoul of Domestic Relations Law § 117 (1) (a).
The Appellate Division, Second Department, unanimously affirmed (209 AD2d 8), but contrary to Family Court, it found that G. M. had standing to adopt under Domestic Relations Law § 110 as an "adult unmarried person.” The Per Curiam opinion limited the dispositional rationale to the effect of Domestic Relations Law § 117 — automatic termination of the biological parent’s rights upon adoption by other than a stepparent. The Court, therefore, ruled that Family Court’s result was correct for the reason that "[cjlearly the intent of the Legislature was to deny a single person the right to adopt another’s child while the natural parent, a single person, retains parental rights” (id., at 10).
Although adoption has been practiced since ancient times, the authorization for this unique relationship derives solely from legislation. It has no common-law roots or evolution (Matter of Seaman, 78 NY2d 451, 455; Matter of Robert Paul P, 63 NY2d 233, 237; Matter of Thorne, 155 NY 140, 143; see generally, Presser, The Historical Background of the American Law of Adoption, 11 J of Fam L 443 [1971]). Therefore, our Court has approved the proposition that the statutory adoption charter exclusively controls (Matter of Robert Paul P., supra, at 238; Matter of Malpica-Orsini, 36 NY2d 568, 572, appeal dismissed sub nom. Orsini v Blasi, 423 US 1042; Carpenter v Buffalo Gen. Elec. Co., 213 NY 101, 108).
*671 The judicial role is most sensitive, but no case has ever recognized a judicially created right of adoption. This restraint is especially pertinent when the Legislature has expressly enacted a plenary, detailed legislative plan (see, Matter of Malpica-Orsini, supra, at 570; Matter of Eaton, 305 NY 162, 165). The majority acknowledges New York’s unique legislative developments and the several major cases in which adoptions have been disallowed (see, e.g., Matter of Robert Paul P, supra) that together document these juridically limiting principles, yet the majority’s ruling and result paradoxically turn away from those consistent guideposts.
Pointedly, this Court’s unqualified utterance is that " ' "[t]he Legislature has supreme control of the subject” ’ ” (Matter of Robert Paul P., supra, at 237 [emphasis added]; see also, Matter of Malpica-Orsini, supra). A transcendent societal goal in the field of domestic relations is to stabilize family relationships, particularly parent-child bonds. That State interest promotes permanency planning and provides protection for an adopted child’s legally secure familial placement. Therefore, statutory authorizations should not be substantively transformed under the guise of interpretation, and all facets of the adoption statutes should be harmonized (see, Matter of Costello v Geiser, 85 NY2d 103, 109; Heard v Cuomo, 80 NY2d 684, 689; Matter of Long v Adirondack Park Agency, 76 NY2d 416, 420, 422-423).
Notably, too, for contextual understanding of these cases, New York State has long refused to recognize common-law marriages (see, Domestic Relations Law § 11). It also does not recognize or authorize gay or lesbian marriages, though efforts to secure such legislation have been pursued (see, 1995 Assembly Bill A-648; 1994 Assembly Bill A-10508).
L
Domestic Relations Law § 110, entitled "Who May Adopt,” provides at its outset that [a]n adult unmarried person or an adult husband and his adult wife together may adopt another person” (emphasis added). Married aspirants are directed to apply "together”, i.e., jointly, as spouses, except under circumstances not applicable in these cases.
In Dana, appellant G. M. asserts that she may petition as "[a]n adult unmarried person,” without regard to the legal consequences of other related provisions of the adoption charter. She petitioned individually and qualifies under section *672 110, irrespective of her sexual orientation. The Dana case, therefore, is not a case involving the right of homosexuals to adopt, nor, self-evidently, is the Jacob case. Satisfying the standing component does not, however, complete the analysis or overcome section 117’s operation-of-law impact on both cases.
Appellants Stephen T. K. and Roseanne M. A. urge that the term "adult unmarried person” should also permit them to adopt "together” as an unmarried couple. They bypass the statute’s plain words by claiming that nothing in the statutory language of Domestic Relations Law § 110 precludes their adoption effort. Preclusion or prohibition, however, are not the point. Petitioners’ burden, ignored by the majority, is to identify a source of statutory authorization.
Petitioners came to court in the Jacob case to adopt "together,” as two unmarried adults. The court must deal with them as they presented themselves and must also obey the statute that on its face allows a joint petition by "married” spouses "together.” The statute unambiguously declares that "[a]n adult unmarried person or an adult husband and his wife together may adopt another person” (Domestic Relations Law § 110 [emphasis added]; Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 110, at 398, 402, 404). Words of such precise import and limitation are not merely talismanic and may not be rendered superfluous, as the majority has done here. The Legislature’s chosen words must be given their substantive, intended meaning, and interpretation is no substitute for its failure to be more explicit or flexible.
The statutory language and its history instructively reveal no legislative intent or hint to extend the right and responsibility of adoption to cohabiting unmarried adults (see, Scheinkman, Supplementary Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 110, 1995 Cum Ann Pocket Part, at 85). The opposite obtains, notably in the Jacob case, in the direct contraindication of Domestic Relations Law § 11 expressing the State’s long-standing public policy refusal to recognize at-will common-law relationships as marriages. Confusion is thus sown by the holdings today by blurring plain meaning words and clear lines between relationships that are legally recognized and those that are not. Under the newly fashioned theory rooted in ambiguity, any number of people who choose to live to *673 gether — even those who may not cohabit — could be allowed to adopt a child together. The result in these cases and reductio ad absurdum illustrations flowing from appellants’ theorem— that singular may mean plural and vice versa under a general axiom of statutory construction inapplicable in the face of specificity — are far beyond any discernible legislative intent of New York lawmakers. Marriages and single parent households are not, after all, mere social conventions generally or with respect to adoption circumstances; they enjoy legal recognition and special protections for empirically proper social reasons and public policies.
The legislative history of adoption laws over the last century also reveals a dynamic process with an evolving set of limitations. The original version enacted in 1873 provided: "Any minor child may be adopted by any adult” (L 1873, ch 830 [emphasis added]). In 1896, the Legislature cut back by stating that "[a]n adult unmarried person, or an adult husband or wife, or an adult husband and his adult wife together, may adopt a minor” (L 1896, ch 272, § 60; see also, L 1915, ch 352; L 1917, ch 149). This language was further restricted, in 1920, when the Legislature omitted from the statute the language "or an adult husband or wife” (see, L 1920, ch 433). Since enactment of the 1920 amendment, the statute has provided that "[a]n adult unmarried person or an adult husband and his adult wife together may adopt” (Domestic Relations Law § 110 [emphasis added]). The words chosen by the Legislature demonstrate its conclusion that a stable familial entity is provided by either a one-parent family or a two-parent family when the concentric interrelationships enjoy a legal bond. The statute demonstrates that the Legislature, by express will and words, concluded that households that lack legally recognized bonds suffer a relatively greater risk to the stability needed for adopted children and families, because individuals can walk out of these relationships with impunity and unknown legal consequences.
Next, the Legislature specified the exceptions in section 110 permitting a married individual to petition for adoption without consent of the other spouse (see, Domestic Relations Law § 110; McKinney’s Cons Laws of NY, Book 1, Statutes § 240 [expressio unius est exclusio alterius — where a statute mentions certain exceptions and omits others, the Legislature intends that the omitted items should be excluded]; Matter of Alonzo M. v New York City Dept. of Probation, 72 NY2d 662, 665; Patrolmen’s Benevolent Assn. v City of New York, 41 *674 NY2d 205, 208-209). The failure of the Legislature to provide for the circumstances of these two cases examined in the light of successive particularized legislative amendatory actions, is yet another cogent refutation of the uniquely judicial authorization of adoption, unfurled today under the twin banners of statutory interpretation and ambiguity.
Lastly in this connection, we derive a diametrically different lesson from Matter of Alison D. v Virginia M. (77 NY2d 651), decided in 1991. The majority for that case held that a lesbian partner is not a "parent” under Domestic Relations Law § 70 (a). The Court expressly rejected an expansionist judicial definition of "de facto parent” or "functional” family (id., at 656) and declined to enlarge legislatively limited delineations (id., at 657). Yet, today’s majority, only four years later, revives and applies that rejected de facto methodology using another nonstatutory, undelineated term, "second parent adoption” (compare, Simpson v Loehmann, 21 NY2d 305, 314 [Breitel, J., concurring] ["Only a major reappraisal by the court, rather than the accident of a change in its composition, would justify the overruling of’ precedent]). The majority now grants legal recognition to what it refers to as functional parents in both cases, the couples comprised of two individuals bound together solely by personally elective affiliation, not by marriage as the statute prescribes. This turnabout should be contrasted again with what the Court in Alison D. actually did: it took a statute at its precise words and gave them effect, because the legally recognized stability of these most sacred human relationships were determined to be paramount by the Legislature and, thus, by this Court.
When the majority augments extant legislation in these cases because the corpus juris does not reflect modern arrangements in which individuals nevertheless yearn to be accorded family status under the law (compare, Matter of Alison D. v Virginia M., supra), it significantly dissolves the central rationale of Alison D. (id.; see also, Simpson v Loehmann, 21 NY2d 305, 314-316, supra [Breitel, J., concurring]). As former Chief Judge Breitel noted in another connection, the "judicial process is not permitted to rove generally over the scene of human affairs. Instead, it must be used, on pain of violating the proprieties, within the framework of a highly disciplined special system of legal rules characteristic of the legal order” (Breitel, The Lawmakers, 65 Colum L Rev 749, 772; see also, Cardozo, The Nature of the Judicial Process, reprinted in Selected Writings of Benjamin Nathan Cardozo, *675 110, 164 [Hall ed 1947] [A Judge "is not a knight-errant, roaming at will in pursuit of his (or her) own ideal of beauty or of goodness.”]). The rulings today constitute a rejection of such wise admonitions about appropriate limitations on the judicial process and power.
The Per Curiam opinion of the Court in Matter of Alison D. v Virginia M. (77 NY2d 651, supra) also instructively refrained from any reliance on or reference to Braschi v Stahl Assocs. Co. (74 NY2d 201). Thus, the incorporation of Braschi into the instant cases is inapposite and should be unavailing, because these are very different cases with very different issues and operative policies.
IL
A key societal concern in adoption proceedings is, we all agree, the best interests of children (see, Domestic Relations Law § 114; Matter of Robert Paul P., 63 NY2d 233, 236, supra). The judicial power to grant an adoption cannot be exercised, however, by simply intoning the phrase "the best interests of the adoptive child” as part of the analysis to determine qualification for adoption. That approach bypasses crucial, threshold steps and begs inescapably interwoven questions that must be considered and answered at the outset of the purely statutory construction issue in these cases. Before a court can arrive at the ultimate conclusion that an adoption is in the best interests of a child therefore, it is first obliged to discern whether the particular application is legislatively authorized. Reversing the analysis erects the building before the foundation is in place.
Best interests, in any event, is not an abstract concept floating in a vacuum, but must be factually rooted, supported by and applied to an evidentiary record. With no findings or record in any prior court in these cases on that issue, we fail to understand how the majority here makes first-instance assumptions to assert and support its conclusions about the best interests of Jacob and Dana as part of the statutory construction analysis.
The dual, statutorily interlocked inquiries of qualifications and operation-of-law consequences of adoption cannot be shunted aside in favor of an aspiration that a potential adoptive person might provide a child with good, better or best emotional or financial circumstances. An intuitive preference that a particular adoption might likely or generally serve *676 some child’s beneficial interests should not suffice to solve the more comprehensive puzzle of legislative intent that will evolve into a ratio decidendi as the juridical adoption charter to govern the whole of a society (see, Domestic Relations Law § 114; compare, Matter of Bennett v Jeffreys, 40 NY2d 543, 546, 552). We note that the disciplined approach we would use in deciding these appeals does not implicate the bona fides or unchallenged loving and caring motivations and feelings of any of the individuals involved in these cases. While promulgated and applied law may take cognizance of those factors, however, it should not be subordinated to them. Also, these children are not members of a suspect class (contrast, Gomez v Perez, 409 US 535; Plyler v Doe, 457 US 202). They are members of stable homes, already presently in the permanent placement and custody of their biological mothers.
Courts are ultimately limited to viewing issues as presented in litigated cases within the confines of their evidentiary records. Since the majority agrees that the common issue in these cases is purely statutory construction, its reliance on generalized assumptions about life and health insurance, Social Security and death benefits, constitutes a questionable policy makeweight. Those criteria offer scant guidance towards discovering legislative intent behind Domestic Relations Law §§ 110 and 117. Moreover, they are incomplete policy factors, inappropriate to statutory construction analysis, and their imputation in these cases simultaneously eschews consideration of any competing substantial State interest concerns.
For the benefit of the two youngsters and the preservation of some orderly procedural regularity, we draw assurance from the corrective action that at least remits each case to Family Court, to undertake a first instance, best interests hearing in the Jacob case, and an updated hearing in the Dana case, now that three years have transpired since the court conducted its original limited inquiry.
IIL
A principal factor in these cases must also ultimately include consideration of the inexorable operation-of-law consequences that flow from section 117, a distinctive feature of New York’s adoption laws. Specifically, courts are statutorily mandated to apply Domestic Relations Law § 110 together with the interconnected features of Domestic Relations Law *677 § 117 (compare, e.g., Matter of Royal Indem. Co. v Tax Appeals Tribunal, 75 NY2d 75, 79; McKinney’s Cons Laws of NY, Book 1, Statutes § 97).
Domestic Relations Law § 117 provides: "After the making of an order of adoption the natural parents of the adoptive child shall be relieved of all parental duties toward and of all responsibilities for and shall have no rights over such adoptive child or to his [or her] property by descent or succession” (emphasis added). The plain and overarching language and punctuation of section 117 cannot be judicially blinked, repealed or rendered obsolete by interpretation.
Section 117 says that it severs all facets of a biological parent’s conjunctively listed relationships upon adoption of the child (compare, Matter of Bennett v Jeffreys, 40 NY2d 543, supra). This Court has recognized that "[t]he purpose of the section [former section 114, now section 117] was to define the relation, after adoption, of the child to its natural parents and to its adopting parents, together in their reciprocal rights, duties and privileges” (Betz v Horr, 276 NY 83, 87; see also, Matter of Gregory B., 74 NY2d 77, 91). That is a critically extant, interpretive proposition from this Court and not some merely atavistic utterance.
In implementation of its prerogative to define family relationships that are accorded legal status, the Legislature even prescribed a stepparent departure from the otherwise automatic section 117 consequence. It thus sought to obviate the inevitable result that an order of adoption might actually effectuate the symbolic Solomonic threat by severing the rights of a consenting biological parent in such specifically excepted circumstances where a biological parent is married to an adopting stepparent. One would have thought promulgation of such an exception unnecessary, yet the Legislature chose certainty of statutory expression for every eventuality as to the severance or nonseverance operation-of-law consequences of section 117.
Appellants in both cases nevertheless propose the theory that section 117 is meant to apply only to inheritance succession of property rights after adoption and should have no effect on the wider expanse and array of rights and responsibilities of a biological parent with an adoptive child. The language of section 117 reveals, however, that the biological parents’ duties, responsibilities and rights with respect to the adoptive child are separate and distinct from, and more com *678 prehensive than, a single, narrow category of inheritance rights. The use of the disjunctive "or” before the phrase, "property by descent or succession,” cannot be discounted or avoided; it denotes the important and elemental legislative demarcation. These observations are not some syntactical or grammatical exercise. Indeed, syntax and grammar are necessary tools of precise expression, acceptable norms of interpretation and reasonably uniform understanding and, when coupled with disciplined, thorough statutory construction principles, they bear legitimately and cogently on sound and supportable legal analysis (see, Matter of Brooklyn El. R. R. Co., 125 NY 434, 444-445).
Besides, section 117 (1) (i) merely defines a particular class of restricted inheritance rights, namely, "intestate descent and distribution” of property. Thus, adopted children and their biological parents may still inherit from one another by will or acquire property by inter vivas instrument (see, 1986 Report of NY Law Rev Commn, reprinted in 1986 McKinney’s Session Laws of NY, at 2560). This again demonstrates that the intestate devolution of property aspect is only a particular species and recent incorporation into this more sweeping, long-standing statute. It does not represent a displacement or total substitution for the statute’s predominant purport.
The majority states that "from the very beginning of what is now section 117, both the scholarly commentary about the section and its dozen or so amendments have centered on issues of property rights and inheritance” (majority opn, at 663). This statement sidesteps and subordinates the original and still operative language of section 117 itself: "The parents of an adopted child are, from the time of the adoption, relieved from all parental duties toward, and of all responsibility for, the child so adopted, and have no rights over it” (L 1873, ch 830, § 12 [emphasis added]). Inheritance was not mentioned and the comprehensive sweep of the statute could not be plainer. Finally, the primacy of this Court’s precedents and legislatively promulgated words as authority must be accorded greater rank and respect than any secondary or tertiary materials characterized as "scholarly commentary.”
Betz v Horr (276 NY 83, supra) is particularly poignant and cogent. There, a sick and destitute adopted adult sought support from her biological father. In rejecting the claim, the Court recognized that the purpose of former section 114 (now § 117) was the complete termination of parental rights and *679 responsibilities of the biological parents following adoption. The Court stated that in order to impose upon the biological parent a duty to support, "it would be necessary to read into section 114 [now section 117] of the Domestic Relations Law an intent to preserve the duty and responsibility of the natural parent to support the child notwithstanding the plain and unambiguous provision that, after adoption, all responsibility of the natural parent for the child ceases” (id., at 88 [emphasis added]; see also, Matter of Harvey-Cook v Neill, 118 AD2d 109, 111). That the biological mothers in these cases may wish that their parental rights not be terminated by an order of adoption is no more determinative than the compelling circumstances of Betz. The statute and our cases remain controlling. Section 117 should not be relegated to, nor was it designed to operate with, case-by-case personal exemptions from universally and equally applied principles of statutory law or precedentially governing authorities.
The rationale of these cases is likely to engender significant legal uncertainty and practical problems between biological and adoptive parents. Conflicts concerning the upbringing of children, for example, with respect to visitation rights, schooling, medical care, religious preference and training and the like, may ensue. Such a net of foreseeable and unseen sequelae is hardly conducive to the settled, permanent, new home environment and set of relationships directed by section 117.
A careful examination of the Legislature’s unaltered intent based on the entire history of the statute reveals the original purpose of section 117 was to enfold adoptees within the exclusive embrace of their new families and to sever all relational aspects with the former family. That goal still applies and especially to the lifetime and lifelong relationships of the affected individuals, not just to the effect of dying intestate (see, L 1963, ch 406; Matter of Best, 66 NY2d 151, 156, cert denied sub nom. McCollum v Reid, 475 US 1083; see also, Mem in Support of Bill by Sponsoring Senator Brydges, Bill Jacket, L 1963, ch 406; see also, Mem to Governor in Support by Attorney-General Lefkowitz, Bill Jacket, L 1963, ch 406).
Not surprisingly, we believe that the majority’s reliance on Social Services Law § 383-c and Domestic Relations Law §§ 114 and 115-b are inapposite and unpersuasive. The use of these attenuated provisions involving entirely different situations to argue for what amounts to a functional, partial repeal *680 by implication of section 117’s unaltered breadth, is a disfavored approach to resolving statutory analysis problems.
IV.
The assembled and varied statutory construction arguments are, in the end, held together by the majority’s tincture of constitutional doubt. A crucial utterance illustrates: "[A] construction of the section that would deny children like Jacob and Dana the opportunity of having their two de facto parents become their legal parents, based solely on their biological mother’s sexual orientation or marital status, would not only be unjust under the circumstances, but also might raise constitutional concerns in light of the adoption statute’s historically consistent purpose — the best interests of the child” (majority opn, at 667 [citations omitted] [emphasis added]). This sweeping amalgam renders doubtful even the opportunity for appropriate statutory amendments to deal with perceived ambiguities. It also tolerates no potential for showing in the future any State interest supporting any enactment regulating this field that could survive equal protection constitutional attack.
This "equal protection” concern was not raised in either case before the lower courts, and the majority’s preemptive cloud, coupled with a failure to deal with that issue’s complexity, and implicated jurisprudential nuances is perplexing (compare, Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 312, 324, 332, 344). Further, the generalization of some hypothesized result being "unjust under the circumstances” (majority opn, at 667), while a matter of general concern to any Judge, cannot supplant specific analysis and avoid rational basis judicial scrutiny within an appropriate and rigorous adjudicatory process and developed record of pleadings and proof on an as-applied basis. Whatever labels are used, no constitutional issue is squarely and thoroughly presented in these cases anyway, nor is any appropriate for speculation on these records. Moreover, the vagueness as to precisely which parties’ — the children or the adopting petitioner or the biological parent — constitutional rights are somehow at risk adds bewilderment to the analysis and frustrates any attempted, precise rejoinder.
Overlaying the entire problem about such projections of facial or applied constitutional doubt, cast upon a complex set of statutes, is the inattentiveness to the fundamental presumption of constitutionality of duly enacted legislation and *681 to the appropriate deference, indeed "supremacy,” of the legislative role in this area (see, People v Thompson, 83 NY2d 477, 487-488; Matter of Robert Paul P, 63 NY2d 233, 237, supra; People v Epton, 19 NY2d 496, 505). These overridden precepts should be central to the dispositional equation in these cases instead of a tenuous statutory construction axiom insinuated on a problematical constitutional premise.
Significantly, this Court did not even have the benefit in these cases of the customary adversarial advocacy dynamic. No briefs or oral arguments supportive of the results below or against the arguments for adoptions were presented, though several amici briefs in support of appellants’ positions were accepted. Thus, one-sided constitutional claims raised for the first time on appeal should especially be foreclosed from this Court’s consideration based on well-settled institutional and precedential principles (see, e.g., People v Gray, 86 NY2d 10, 20; Lichtman v Grossbard, 73 NY2d 792, 794; Melahn v Hearn, 60 NY2d 944, 945; Matter of Eagle v Paterson, 57 NY2d 831, 833; People v Martin, 50 NY2d 1029, 1031; Wein v Levitt, 42 NY2d 300, 306; Cohen and Karger, Powers of the New York Court of Appeals § 169, at 641 [rev ed]; see also, Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57, 71 [Simons, J., concurring]). We emphasize that it is the dubiety cast over very significant constitutional propositions in this fashion that is at least as disquieting as an unequivocal constitutional declaration. This is especially so since the Attorney-General of the State was given no notice or opportunity, as required by Executive Law § 71, to fulfill the obligation of the Department of Law to defend the constitutionality — or against the inchoate unconstitutionality — of the beclouded statutes.
The instant two cases also take the constitutional hook of Matter of PatchogueMedford Congress of Teachers v Board of Educ. (70 NY2d 57, supra), where the assertion of a general constitutional claim in a pleading was used by this Court to reach a specific State constitutional basis for decision, two giant steps beyond that significant jurisprudential outer limit. Now, parties may assert constitutional claims at the final appeal stage and appellate courts may drive a debatable statutory construction wedge — a speculative, future constitutional concern — into the disposition of very significant statutes and cases.
The majority’s constitutional prognostication is thus linked *682 to a statutory construction device that teaches courts to avoid reaching constitutional issues when they need not. The rubric is dubiously applied here, however since it is designed primarily to respect the presumption of constitutionality, not becloud it. The presumption is a reservoir of judicial power, preserving judicial capital, resources and power for when they are most and unavoidably needed. The rubric has never been used, as here, to anticipate amorphous doubt over statutes as applied to real, future cases and controversies. By employing a canon of construction to, in effect, reach an unlitigated issue in order to avoid potentially "embarrassing constitutional questions” in the future, the majority in the instant cases violates the very canon it invokes. It ultimately also transgresses another overriding canon, that courts should not legislate under the guise of interpretation (see, e.g., People v Finnegan, 85 NY2d 53, 58; People v Heine, 9 NY2d 925, 929).
The majority concludes that "[g]iven that section 117 is open to two differing interpretations” — a conclusion with which we have already noted our strong disagreement in any event — the Court must construe the statute to avoid constitutional doubt (majority opn, at 667, 667-668, 668, citing principally Matter of Lorie C., 49 NY2d 161,171). That case dealt with the State constitutional limits on the jurisdiction of the Family Court in placing juvenile delinquents in foster homes. Since the statutory construction issue directly implicated article VI, § 13 of the State Constitution, it is arguably appropriate for the Court to have added a dictum concerning the special court’s jurisdictional limits under the State Constitution. As the Court noted, the statutory question involved the "doctrine of distribution of powers ' "that each department should be free from interference, in the discharge of its peculiar duties, by either of the others” ’ ” (Matter of Lorie C., supra, at 171, quoting Sexton v Carey, 44 NY2d 545, 549). Here, the would-be constitutional question involves nothing of that kind and does not implicate a powers section of the State Constitution; rather, it forecasts an equal protection "concern.”
As the Court has elsewhere observed, failure to raise a constitutional issue in nisi prius courts results in an inadequate record, lack of joinder, and lack of development and testing of adjudicative analysis to permit and justify the appellate court to make its fair, reasonably tested and long-lasting determination and precedent on the merits (see, People *683 v Gray, 86 NY2d 10, 20, supra; People v Martin, 50 NY2d 1029, 1031, supra). Furthermore, if a litigant does not raise a particular legal argument before a court of first instance, that effectively deprives the other party — if there is one, as there is not in these cases — of a fair opportunity to present and answer the proofs and deprives the process of jurisprudence of the essential check-and-balance against unilateral mistake or misapprehension. This Court has also repeatedly warned that "if any unsought consequences result, the Legislature is best suited to evaluate and resolve them” (Bender v Jamaica Hosp., 40 NY2d 560, 562, citing Bright Homes v Wright, 8 NY2d 157; see, Matter of Robert Paul P., 63 NY2d 233, 239, supra). These cautions are uniquely appropriate with respect to the Legislature’s concededly "supreme” power and provenance concerning its legal creature: adoptions.
In sum, the common issue here involves a subject on which the Legislature has expressed itself. These cases appear on a screen on which the Legislature has delineated its will and judgment methodically and meticulously to reflect its enactments. Ambiguity cannot directly or indirectly create or substitute for the lack of statutory authorization to adopt. These adoption statutes are luminously clear on one unassailable feature: no express legislative authorization is discernible for what is, nevertheless, permitted by the holdings today. Nor do the statutes anywhere speak of de facto, functional or second parent adoptions. Frankly, if the Legislature had intended to alter the definitions and interplay of its plenary, detailed adoption blueprint to cover the circumstances as presented here, it has had ample and repeated opportunities, means and words to effectuate such purpose plainly and definitively as a matter of notice, guidance, stability and reliability. It has done so before (see, e.g., L 1984, ch 218 [permitting adoption by adults not yet divorced]; L 1951, ch 211 [permitting adoption by a minor]).
Because the Legislature did not do so here, neither should this Court in this manner. Cobbling law together out of interpretative ambiguity that transforms fundamental, societally recognized relationships and substantive principles is neither sound statutory construction nor justifiable lawmaking. Four prior courts in these two cases correctly dismissed the respective adoption petitions. Since those appropriate judicial determinations are based on what the Legislature actually enacted and specifically authorized, the Appellate Division orders should be affirmed.
*684 Judges Smith, Levine and Ciparick concur with Chief Judge Kaye; Judge Bellacosa dissents and votes to affirm in a separate opinion in which Judges Simons and Titone concur.
Order reversed, etc.